## W. F. WYMAN V. VIRGILE HERARD.

(Filed Aug. 26, 1899.)

1. ACTION ON CONTRACT—*Counter-Claim.* The counter-claim of the defendant in this action is one so arising out of the transaction set forth in the petition as the foundation of the plaintiff's claim. and is so connected with the subject matter of that action, that it is properly involved in the action for a complete determination thereof and a settlement of the questions involved therein, as between the plaintiff and defendant.

2. SAME—*Pleadings—Jurisdiction—Summons—Waiver.* Since the plaintiff sought the jurisdiction of the court below, and since the counter-claim of the defendant arose out of the transaction set forth in the petition and is connected with the subject matter of the action, the counter-claim is properly filed in the cause, and jurisdiction is obtained by the court as against the defendant; and in such case a provision of the Code of Civil Procedure which declares, that "Every other action must be brought in the county in which the defendant, or some one of the defendants reside or may be summoned," is waived by the plaintiff, and does. not apply here.

3. SAME—*Pleading—Sufficiency.* It is not necessary that a counter-claim should be founded in or arise out of the contract set forth in the petition. It is sufficient if it arises out of the transaction set forth in the petition, or is connected with the subject of the action.

4. PLEADING—*Petition—Demurrer—Defects Waived, When.* The Code or Civil Procedure, sec. 89, provides that "the defendant may demur to the petition only when it appears upon its face, * * Fourth. That there is a defect of parties, plaintiff or defendant; * * Sixth. That the petition does not state facts sufficient to constitute a cause of action." Where affirmative relief is sought by the counter-claim, to which the plaintiff replies, he cannot.

afterward take advantage of the fact that the counter-claim is insufficient in law, or that there are other parties to the action. The same rules of pleading apply in this respect to the counter-claim as to a petition, and if either the counter-claim or petition be insufficient, or defective for want of parties, the defect must be taken advantage of by demurrer. Otherwise, it is waived.

5. TRUST—*Beneficiaries of—Rule.* The rule that all beneficiaries of the trust should be before the court, is one which has been established for the protection of the trustee, and in order to avoid the repeated vexation of the trustee by a multiplicity of suits; and if the trustee waives the protection of this rule, he may dispense with other persons in a case like the present, in which suit is brought by the trustee against one of the beneficiaries of the trust, and in which the defendant's rights may be protected, and it is apparent to the court that no injury or injustice will result thereby to other beneficiaries of the trust.

6. PROMISSORY NOTES—*Mortgage Liens—Assignments of—Priority.* In a case like the present, in which the promissory notes were given as evidence of indebtedness for loans of money advanced, and trust mortgages were given upon cattle to secure the payment thereof, and it was provided in the trust mortgages that the cattle should be shipped to a commission company and the proceeds of such sale should be applied to the payment and discharge of all of such notes remaining unpaid, in the order of priority, then the note-holders who took the assignment of the notes and mortgages secured by the trust mortgage, had a right to have the proceeds of the sale of the cattle so applied, and having, of course, notice of the terms of the mortgage, if the proceeds should be misapplied by the commission company, yet the law makes the application of proceeds, in the order of priority, as provided in the trust mortgage, and subsequent lienors are entitled to the application of this principle and to its enforcement, and the mortgages will be discharged according to their priority as to subsequent lienors, upon a sale of sufficient of the property by the commission company to satisfy the notes secured by them, whether the proper credits are entered or not. The money having been received by the commission company, the contract at once appropriates it to the payment of the notes, according to their priority, although, as between mortgagor and mortgagee, the debt may remain and still would be unpaid, if the money, the proceeds arising out of the sale of the mortgaged property, should be actually misapplied by the commission company or agents named in the mortgage.

7. TRIAL—*Evidence—Findings Not Disturbed, When.* The case was heard in the trial court by the judge, without a jury, much of it being upon oral evidence. Where there is evidence reasonably tending to support the findings, they will not be disturbed here.

8. TRUSTEE—*Responsibility for Loss.* The trustee will be responsible for any mismanagement of his trust. It is one of the first duties of the trustee after his appointment and acceptance of the trust, to secure possession of the trust property, and to protect it from loss and injury. He must use the same care for the safety of the trust fund and for the interests of the *cesti que trust* that he uses for his own property and interests, and will be responsible for any loss that may occur to the trust fund.

9. ACTION—*Dismissal—Judgment.* Dismissals of causes, under the Code of Civil Procedure in the Statutes of 1893, are judgments which neither of the parties, nor the clerk, nor all together, but only the court, can render. A plaintiff without any order or judgment of the trial court, could not, under the provisons of the Code as they then existed, actually dismiss his case, without an order of court.

10. SAME—*Right of Defendant to Proceed.* When a set-off or counter-claim has been presented, the defendant has the right to proceed to the trial of his claim, although the plaintiff may have dismissed his action or failed to appear. .

11. PERSONAL PROPERTY—*Mortgage—Description.* Bulls and cows are not covered by a mortgage which undertakes to include only one and two-year-old steers, and where the only testimony which appears touching these items was that they were "bulls and cows," such testimony will not include a finding of fact that they were covered by a mortgage which includes only one and two-year-old steers.

(Syllabus by the Court.)

*Error from the District Court of Kay County; before A. G. C. Bierer, District Judge.*

*Trimble & Braley* and *John A. Eaton,* for plaintiff in error.

*Botsford, Deatherage & Young* and *Asp, Shartel & Cottingham,* for defendant in error.

STATEMENT OF THE CASE.

This action was begun October 2, 1895, in the district court of Kay county, to recover the contract price of

certain cattle sold by the plaintiff, plaintiff in error here, to the defendant.

The petition averred that during the month of July, 1893, J. P. Baird and J. R. Ingram, as the firm of Baird & Ingram, executed five separate chattel mortgages to the Fish & Keck Commission company, engaged in the business of buying and selling live stock on commission, at Kansas City, Missouri, with George O. Keck as president, and F. O. Fish as secretary and treasurer; in each of which mortgages security was given upon "one thousand head of steers, two years old," to secure the payment of promissory notes described therein, varying in amounts from $2,000 to $6,000 and aggregating in the whole the sum of $29,000. The cattle were described as located upon the "John Brown ranch, in the Seminole Nation, of the Indian Territory."

It was further averred that on July 29, 1893, the date of the last of these mortgages, for the purpose of creating the plaintiff a trustee for the holders of these several notes, Baird & Ingram executed to the plaintiff, as trustee, for the holders of the notes described in the mortgages referred to, a mortgage upon 5,300 head of cattle situated upon the John Brown ranch, to secure the promissory notes and indebtedness contained therein.

This mortgage provided that the cattle should be kept upon the range until the maturity of these notes, unless sooner marketed with the consent of the trustee, and further provided that the cattle be shipped and consigned for sale to the Fich & Keck company, and the proceeds applied to the payment and discharge of the notes mentioned in the mortgages referred to, in the order of

their priority, and that the cattle were to remain in the possession of Baird & Ingram, until default, and with authority to Wyman to take possession of them and sell them for the payment of the notes.

It was further averred that there were 1,100 head of 1-year-old steers upon the ranch, and that on the same day, July 29, 1893, Baird & Ingram executed to the Fish & Keck company their chattel mortgage thereon to secure five notes, one of $4,325.58; one of $2,629.15; one of $3,677.92; one of $5,012.30; one of $3,865.74, making a total of $19,510.72.    These several mortgages were endorsed as payable to W. F. Wyman, trustee, or order, by the Fish & Keck company.

Upon the same day Baird & Ingram executed and delivered to the Fish & Keck company a chattel mortgage to secure the same notes as described in the last mentioned mortgage upon the 1,100 head of 1-year-old steers described in the last mortgage, and upon the 5,300 head of 2-year-old steers described in the mortgage of July 29, 1893, in which Wyman was created trustee. This mortgage also stated that it was a second mortgage on said steers, and that the property should be consigned, when marketed, to the Fish & Keck company, at Kansas City, and sold, and the proceeds of the sales should be applied to the payment of all the notes then remaining unpaid.  Upon the same day this last named mortgage was assigned by the Fish & Keck company to Wyman, as trustee, for the holders of the notes described in the second mortgage of 5,300 head of 2-year-old steers.  The assignment expressly provided that all the interest of the Fish & Keck company was transferred and assigned to Wyman, as trustee, for the payment of

five notes specified in the mortgage as aggregating $19,-510.72. The assignment specified only that the 5,300 head of 2-year-old steers should be included in the assignment.

The petition specially averred that "by reason of the said declaration of trust and the said assignment of mortgages, the plaintiff became and was the trustee for the several holders of the notes mentioned and described in each and all of said mortgages, and as such, he obtained, through the former employees of Baird & Ingram, the possession of the cattle mentioned therein, and thereafter sold therefrom a sufficient number, about 2,000 head, with which to satisfy all of the first mentioned promissory notes."

And further averred that all of said promissory notes mentioned in the last mortgages named remained and still were unpaid, and that suit was brought by the plaintiff, as trustee, for the use and benefit of the holders of the said several promissory notes.

It was further averred that on the 13th day of May, 1895, the plaintiff, by written contract with the defendant, sold to the latter all of the cattle then remaining upon the pasture referred to, and that the value of them was found to be $12,583, at the price named on the contract.

And that the defendant had executed his promissory note for $1,000, under the contract, payable at two months with 10 per cent. interest, which was executed and delivered to the plaintiff as a guarantee of performance, and that the amount should be forfeited in case of the defendant's faliure to comply therewith. The pe-

tition declared the contract forfeited, and the amount thereof due, as a forfeit to the plaintiff, and that he was entitled to recover the same, together with the sum of $12,583, the price of the cattle having been found to be on the range, for which he prayed judgment.

Thereafter, on the 11th day of August, 1896, the defendant filed his amended answer and counter-claim, by which, after denying generally the allegations of the petition, except as specially admitted,' the defendant charged that on the 12th day of August, 1893, Baird & Ingram executed to the Fish & Keck company a chattel mortgage for the security of the sum of $40,000, represented by two promissory notes of $20,000 each, of even date therewith, covering the 5,300 head of 2-year-old steers and the 1,100 head of 1-year-old steers, and expressly reciting the prior mortgages upon them, and further providing that the cattle should be shipped and consigned for sale to the Fish & Keck company, at the stock yards at Kansas City, Kansas, and the proceeds of such sale should be applied to the payment and discharge of all the notes therein secured then remaining unpaid.

And that on the 15th day of August, 1893, this mortgage was assigned to the plaintiff herein, as trustee, of the mortgage of August 12, 1893, and transferring the two notes of $20,000 each to W. F. Wyman, as trustee, as collateral security to secure the indebtedness of the Fish & Keck company to Louis Border for $10,000, S. J. Garvin for $6,000, G. F. Putman for $4,000, and Virgile Herard, the defendant, for $20,000.

The defendant averred that he was the holder of $20,000 of the $40,000 indebtedness secured by the mort-

gage of August 12, 1893, and that it was unpaid. The answer charged that the plaintiff accepted the trust created in the assignment, and took possession of the cattle described in the mortgages, and has disposed of them and realized therefrom enough money to discharge the whole indebtedness described in the mortgages, including the debt of $20,000 due to the defendant.

The defendant charges further in his answer that from the time of the execution of the said mortgages and assignments, the plaintiff has rendered no account of any disposition or appropriation in payment of the indebtedness set forth in the petition and answer, but had concealed from the defendant the numbers, times and amounts, of sales of the cattle sold, and any payments which he had made, and prayed that the plaintiff should be ordered to make a full accounting of all sales, and of all his acts as trustee, acting under the trusts of the mortgages and assignments so made to him.

Thereafter, upon the 24th day of October, 1896, the plaintiff replied, admitting that he was the trustee under the deed of trust stated in the answer, and in the trust instruments executed prior thereto, and denying generally the other allegations of new matter, and averred that he had made a full statement and accounting of his trust, and that the defendant ought not to be allowed to maintain his counter-claim for an accounting, for the reason that, in order to make such an accounting, it was necessary that the money due the plaintiff, as trustee, from the defendant, be entered and considered therein, and the respective portions of the several beneficiaries under the several deeds of trust ascertained,

and that none of the beneficiaries were parties therein, nor were they necessary parties in this action, and that the plaintiff was estopped, by his written contract set forth in the pleadings, to ask for an accounting until he shall have paid the amount due under the contract, and until all the parties interested are before the court in proper action therefor; and he alleged that the moneys due under the contract pleaded, for the purpose of accounting to the beneficiaries under the second mortgage stated in plaintiff's petition, had been paid.

Thereupon, the plaintiff having been ordered by the court to render a full account, he filed an account, in which he stated in particular the mortgages set out in his petition, averring that the deed of trust of July 29 required him, as trustee, to recognize the priorities fixed by the five mortgages executed to Fish & Keck company, and in subordination to which the deed of trust to him, as trustee, was to be carried out.

He also set forth an additional item of the liabilities from Baird & Ingram to Fish & Keck company, as embodied in a note, specified as note 13, dated August 30, 1894, to secure the payment of the sum of $5,000, due February 28, 1895, with interest at 10 per cent. from maturity, declaring that this liability in no way related to the trust of plaintiff, and was secured upon cattle in no wise mentioned in the mortgages relating to plaintiff's trust, the same being upon 300 head of steers, 4 years old and up, then claimed to be located upon the ranch of Baird & Ingram.

He further stated in a report accompanying his account, that the mortgages covered an aggregate of 6,700

head of cattle, of which he had received 2,061, amounting in the aggregate to $40,233.53, and that out of that sum he had paid notes included in the first mortgages, and up to and including the various liabilities up to July 29, 1893, including the note dated August 30, 1894, for the sum of $5,000, and that he had disbursed a large sum of money in the care of the cattle covered by the mortgages, and he claimed and held in his possession, as trustee, enough cattle to discharge the remainder of the liabilities of Baird & Ingram and Fish & Keck company set out in the pleadings, including the two notes for $20,000 each, dated August 12, 1893, and due March 12, 1894, one of which had been transferred to the defendant, and was admitted to be now held by him and unpaid. And he claimed that if there were no losses to the cattle covered by the mortgages and deeds of trust, there should be 4,639 head remaining on the range unsold.

It further appeared from the testimony that an account was kept upon the books of the Fish & Keck company, between the corporation, and Baird & Ingram, and that in its account sales, the cattle kept up to the time of the death of J. P. Baird, which occurred some time prior to November, 1894, when Wyman first took possession of the cattle. After that time Wyman made various sales of the cattle and a detailed account of them also appears in connection with his amended reply, and as testimony.

The case was tried to the court, without a jury, was continued from time to time, and upon February 15, 1897, submitted for decision, and upon the 10th day of

August, 1897, the court made special findings of fact, as follows:

"Now on this 10th day of August, A. D. 1897, said cause coming on for hearing, pursuant to the submission of the same to the consideration of the court at the last term of this court, and the court having said cause under advisement, makes the following findings of fact, to-wit:

1. "The court finds that the indebtedness secured by the mortgage executed by Baird & Ingram to the Fish & Keck Commission company, on the 29th day of August, 1893, secured a valid indebtedness for the amount stated in said mortgage, to-wit:

"Three notes dated July 9, 1893, for $2,000, due six months after date, with interest at the rate of 10 per cent. per annum from date; two notes for $2,500 each, dated July 13, 1893, due in six months after date, with interest at the rate of 10 per cent. per annum from maturity; three notes dated July 15, 1893, for $2,000 each, due six months after date, with interest at the rate of 10 per cent. per annum from date; three notes dated July 22, 1893, for $2,000 each, due six months after date, with interest at the rate of 10 per cent per annum from date; one note for $6,000, dated July 29, 1893, due in six months after date with interest at the rate of 10 per cent, per annum from date; making a total indebtedness of $29,000, with accuring interest thereon upon $24,000 of said indebtedness, at the rate of 10 per cent. per annum from date, and a total of $5,000 of said indebtedness at the rate of 10 per cent. per annum from maturity.

2. "That the said Fish & Keck Commission company, the mortgagee in said first mortgage, under and by virtue of the terms of said mortgage which authorized and required the shipment and consignment of the said mort-

gaged cattle to the said Fish & Keck Commission company for sale, and application upon the said mortgaged indebtedness, received of the property covered by the said first mortgage, and sold and disposed of the same on the following dates, and for the following amounts, to-wit:

| | |
|---|---|
| August 14, 1893, 303 cattle | $ 4,582.70 |
| August 31, 1893, 59 cattle | 1,100.75 |
| September 4, 1893, 294 cattle | 4,287.70 |
| September 26, 1893, 240 cattle | 3,389.85 |
| October 17, 1893, 24 cattle | 619.44 |
| November 2, 1893, 29 cattle | 439.07 |
| November 4, 1893, 1 cattle | 10.85 |
| Total | $14,430.36 |

3. "That on the said 29th day of August, 1893, said Baird & Ingram made a second mortgage upon the property included in the first mortgage, together with 1,100 head of other steers, making 6,400 head of steers in all to the said Fish & Keck Commission company, which said mortgage also provided that the said cattle should be shipped to the said Fish & Keck Commission company, and by them sold and applied in payment of said mortgage; and which said mortgage was made to secure five notes for the following amounts, to-wit: $4,325.58, $2,629.18, $3,677.92, $5,012.30, $3,865.74, and were each dated July 29, 1893, and were due six months after date, with interest at the rate of 10 per cent. per annum from date.

"The court finds that these notes were transferred by endorsement by the Fish & Keck Commission company to sundry parties in equivalent amounts of said various notes, and delivered to plaintiff for their benefit, and that thereafter and before the maturity of said notes, said Fish & Keck Commission company paid their indebtedness to the parties for whose benefit the said notes

for the sum of $2,629.18, and the said sum of $3,677.92 were deposited with plaintiff, and which transactions occurred after the making and assignment of the third mortgage, heretofore referred to; and the court finds that by the payment and satisfaction by the said Fish & Keck Commission company, the two last mentioned notes were discharged, and the lien of the said mortgage to that amount, as against the defendant, was extinguished.

"The court further finds that there was paid on others of said notes secured in said second mortgage, out of the other funds than the sale of the mortgaged property, the following sums, to-wit: July 31, 1893, $1,934; November 25, 1893, $1,000; August 16, 1894, $1,119.35, and which said payments, in their respective amounts thereon, extinguished the lien of the second mortgage, as in favor of the defendant in this action to the amount of such payments.

4. "That on the 12th day of August, 1893, the said firm of Baird & Ingram made a chattel mortgage to the Fish & Keck Commission company, on the same property included in the first and second mortgages, for the sum of $40,000, and on the same date this mortgage was assigned by the said Fish & Keck Commission company to W. F. Wyman, as trustee, to secure the indebtedness of the Fish & Keck Commission company to various parties, and of whom the defendant, Virgile Herard, was one, and the amount of the indebtedness secured in favor of the said Virgile Herard, was and is, the sum of $20,000, and that the said Virgile Herard thereby became entitled to one half of the security afforded by the said third mortgage, and no part of the indebtedness of the said Fish & Keck Commission company to the said Virgile Herard has ever been paid.

5. "That the said Fish & Keck Commission company, during the year 1894, received of the mortgaged prop-

erty, at the following dates, the following amounts, which was by the said Fish & Keck Commission company sold as follows, to-wit:

| | |
|---|---|
| June 14, 1894, 1 cattle | $ 26.97 |
| August 7, 1894, 1,000 cattle | 20,000.00 |
| August 14, 1894, 42 cattle | 310.25 |
| August 30, 1894, 300 cattle | 6,000.00 |
| Total | $26,336.92 |

"And which said sum, together with the amounts realized by the said Fish & Keck in the year 1893, as aforesaid, from the sales of the said cattle, aggregated the sum of $40,767.28, and by the terms of the various mortgages the said Fish & Keck Commission company were authorized to receive said cattle, and to receive said moneys, and that the receipt of the moneys arising from the sale of said cattle operated in satisfaction and extinguishment of the said mortgages in their priority, and that the said moneys so received by the said Fish & Keck Commission company are sufficient to fully discharge and satisfy all of the indebtedness due on the first and second mortgages, and which, as against this defendant, constitute a lien thereon.'

6. "That the said plaintiff, W. F. Wyman, of the property secured and covered by the said chattel mortgages, sold and disposed of the following amounts of said cattle at the following times and of the following amounts, to-wit:

| | |
|---|---|
| December 1, 1894, 22 head of cattle | $ 220.50 |
| December 21, 1894, 387 head of cattle | 6,948.50 |
| December 31, 1894, 349 head of cattle | 7,003.27 |
| April 13, 1895, 2 head of cattle. | 61.26 |
| May 1, 1895, 12 head of cattle. | 134.68 |
| Total. | $14,368.21 |

"That in addition to said sales so made of said cattle, the said W. F. Wyman, plaintiff, sold to the said Virgile Herard, defendant, on the 13th day of May, 1895, 428 head of cattle, at and for the agreed price of $8,758, and no part of which said sum $8,758 has been paid by the defendant to the plaintiff.

7. "The court hereby allows the expenses of the said trustee in the execution of his trust, as claimed for in the bill of particulars attached to his reply in the sum of $4,001.09, being the amount in full of the actual disbursements of the said trustee as shown in the account thereof in his reply and his supplemental account, leaving the sum of $10,367.12, which the said trustee shall have applied to the payment and satisfaction of the indebtedness secured by said third mortgage.

"And the court hereby takes said cause under further advisement under the evidence and the law as to whether said trustee shall be charged therewith or exonerated therefrom. To which said findings and each and all of them the said plaintiff duly excepted and excepts, and thereafter the plaintiff filed his exceptions and motion to set aside said findings, which is by the court overruled, to which said plaintiff excepted.

"A. G. C. BIERER, Judge.

The cause remained open for this purpose, the plaintiff afterward requesting the court to make the following additional findings of fact, and each of them, upon which the action of the court is indicated, as follows:

I. "That the amounts received by the Fish & Keck company be reduced by the sums paid by them on the notes for which the notes and second mortgage were given, viz:

"On Aetna National Bank, note, $1,934.00.

"On Aetna National Bank, note, $1,000.00.

"On Wade note, $1,119.55.

"Barth note paid in full, and the fifth note paid in full, as well as the interest thereon, said notes being in the principal sums of $2,629.18, and $3,677.92.

"Refused and excepted to,

"A. G. C. Bierer, Judge.

II.    "That the plaintiff have credit for the amount paid upon the $5,000 note and mortgage on the 4 and 5 year-old steers, dated August 30, 1894, the amount paid being $4,966.67.

"Refused, excepted to,

"A. G. C. Bierer, Judge.

III.    "That the court find and state the items of expenses allowed as a credit to the plaintiff and stated in his reply and amendment thereto.

"Allowed and stated as follows:

IV.    "That the court find and state the compensation of the plaintiff as trustee and his expenses and attorneys fees incident to the accounting in this action.

V.    "That the court find and allow the judgments in favor of Herbert & Lewis and Blanchard & Wood, and the costs in the suits brought by them.

"Allowed in the sum of ............................

VI.    "Some of the following statements are correct and some are incorrect. As a statement of a true account it is denied, excepted to.

"A. G. C. Bierer, Judge.

"That the court state the account and make findings of fact, as follows:

"As shown by the proof and the books of the Fish & Keck company, and the account of notes and interest and payments thereof, were kept upon the books of the Fish & Keck company, until Wyman took possession of the cattle upon the death of Baird, in October, 1894. This, for the reason that the mortgages made the Fish & Keck

company, the agents for the sale of the cattle and application of the proceeds.

"The following are the notes secured by the first mortgage, or what is termed the first mortgage, being the five separate mortgages to the Fish & Keck company, upon 1,000 head each, and the deed of trust of July 29, 1893, to W. F. Wyman, trustee, upon 5,300 head of cattle:

| | DATE. | AMT. | DUE. |
|---|---|---|---|
| 1. | July  6, '93, | $2,000 | Jan.  9, '94, @ 10 p. c. from date |
| 2. | July  6, '93, | $2,000 | Jan.  9, '94, @ 10 p. c. from date |
| 3. | July  6, '93, | $2,000 | Jan.  9, '94, @ 10 p. c. from date |
| 4. | July 10, '93, | $2,500 | Jan. 13, '94, @ 10 p. c. from mt'y |
| 5. | July 10, '93, | $2,500 | Jan. 13, '94, @ 10 p. c. from mt'y |
| 6. | July 15, '93, | $2,000 | Jan. 18, '94, @ 10 p. c. from mt'y |
| 7. | July 15, '93, | $2,000 | Jan. 18, '94, @ 10 p. c. from mt'y |
| 8. | July 15, '93, | $2,000 | Jan. 18, '94, @ 10 p. c. from mt'y |
| 9. | July 22, '93, | $2,000 | Jan. 22, '94, @ 10 p. c. from mt'y |
| 10. | July 22, '93, | $2,000 | Jan. 22, '94, @ 10 p. c. from mt'y |
| 11. | July 22, '93, | $2,000 | Jan 22, '94, @ 10 p. c. from mt'y |
| 12. | July 29, '93, | $6,000 | Feb. 22, '94, @ 10 p. c. from mt'y |

"This indebtedness was extended six months from its maturity, which would make it fall due in July, of 1894. They thus ran for one year, during which time interest accumulated to the amount of $2,900.

"The following are the sales made prior to Wyman's taking possession:

1,000 head to Baird & Hazel, August
  7, 1894, ............................................................$20,000.00
300 head to J. E. Colbert, August 16,
  1894 ...................................................................  6,000.00
                                                                            _____
      Total.............................  ...................................... $26,000.00

"This sum became available soon after these sales, and payments were made therefrom of notes 1 to 11 inclusive, a total in principal of $23,000. Interest had

accumulated on the $29,000 indebtednesss and been paid is renewals, in the following sums:

Discount, note August 30, 1893, ............. $250.00
Interest six months on two $2,500 notes
  extended to July 1, 1894, .................. 250.00
Interest six months, notes due January
  18, 1894, extended six months, ............. 300.00
Interest $6,000, note due January 22, 1894 300.00
Interest notes extended to July 16. 1894, 75.00
Sixty-three days interest on notes ex-
  tended, ......................................... 43.75
Interest due July 22, 1894, ................. 98.33
Interest due July 7 and 13, 1894, ......... 47.91
Interest notes dated July 6, 1893, ......... 780.00
Interest due at final payment on $29,000
  secured by first mortgage, ............... 870.00
Interest on account with Wyman, trustee, 181.40

The following payments were made on account of expenses:

Recording mortgage......................$    13.60
Recording mortgage, ....................... 5.83
Recording transfers, ...................... 15.50
Making a total of ....................... $3,231.32

"This total is less than the interest on the $29,000 first mortgage, to the date of payment which was as shown in September, 1894. The account should be thus stated as shown from the books of the Fisk & Keck company:

        Dr.
To cattle sold ......................... $26,000.00
        Cr.
By notes Nos. 1 to 11................... $23,000.00
By interest and expenses............... 3,231.32

                        $26,231.32

Overpaid ......................... $    231.32

"The above items appear in the account all indicated 'Wyman' in the copy of the books attached to the depositions of Frank O. Fish.

"While it may be noted that the dates shown on this copy of the account are not strictly and accurately stated, yet the identity of the indebtedness is readily ascertained, as well as the items of payment. The last items shown upon the account appear in the statement hereinafter shown from the books of Wyman; they relate to note No. 12, and sales of cattle after Wyman took possession, after which date all the account is shown on the Wyman books, and no attempt is made to keep a correct account on Fish & Keck company's books. The item of $1,169.67 for labor, has been entirely eliminated, as we find that it is the total of the items to December 14, 1894, shown in the account of disbursements upon the books of Wyman.

"The receipts after Wyman took possession are as follows:

| | |
|---|---:|
| Dec. 1, 1894, 22 head sold | $ 220.50 |
| Dec. 31, 1894, 387 head sold to R. M. Smith | 6,948.50 |
| Dec. 31, 1894, 349 head to J. Hazel | 7,003.27 |
| April 18, 1895, 3 head sold on market (2 steers and 1 bull) | 61.26 |
| May 1, 1895, 12 head sold on market | 134.68 |
| Nov. 10, 1896, 1 steer sold, check of Arthur Jones by O. G. Young | 20.00 |
| | |
| Total receipts after Wyman took possession | $14,388.21 |

"The above account of sales included the 300 head of 4 and 5-year-olds not covered by Mr. Wyman's trust.

"Upon making sales notes were paid, as follows:

| | |
|---|---|
| Dec. 31, 1894, Note No. 12, with interest from Feb. 1, 1894, to which interest had been paid and note extended ............................................................ | $ 6,253 34 |
| Dec. 31, 1894, Note No. 13, which was the $5,000 note secured by mortgage on the 4 and 5-year-olds, paid before maturity, less discount of $33.35 ............................................................ | 4,966.67 |
| Total ............................................................ | $11,220.01 |

"Which deducted from the total receipts by Wyman, leaves $3,168.20 in Wyman's hands, accounted for hereinafter in disbursements.

"Items of disbursements appearing on pages 443 and 444, case-made, are here entered in the finding, amounting to $3,392.25.

"There is a suit pending in the circuit court of Jackson county, Missouri, brought by *Herbert & Lewis v. W. F. Wyman*, in which they claim $456.58 attorney's charges and fees for services rendered in the matter of accounting and settlement of partnership transaction of Baird & Ingram, in the United States court at Ardmore. The defendant Wyman admits the rendition of the services, and recovery of the amount will doubtless be allowed against him as trustee, for the above amount and interest, together with costs. Interest and costs will, as we estimate, be at least $60.

"Suit has been brought against W. F. Wyman, trustee, by Blanchard & Wood, before W. C. Ebert, justice of the peace, Jackson county, Missouri, claiming $69.80 on account of merchandise sold to the manager of the ranch. A recovery will doubtless be allowed in this suit for the amount of $69.80 and costs, which interest and costs is estimated to be $25. The expense of administer-

ing the trust, as to compensation of the trustee and his attorneys, has not been paid, except expenses as noted in the itemized account of disbursements. The trustee has, as shown by the accounts, rendered extensive services in and about the trust, there being many transactions and details requiring his attention, as well as the keeping of accounts and incurring the responsibility of disbursements of funds shown by the statement. In connection with the trust there was a large amount of litigation existing between the administrator of John P. Baird and this trustee, in which the trustee was compelled to make an accounting at Ardmore, and in reference to this litigation, the trustee has been compelled to make a number of trips to Newkirk and one to Perry, and much labor has been necessitated in and about this litigation in making copies of papers. For these services and accounting he should be allowed reasonable compensation, and the trustee claims that his compensation in the premises should be $1,000. In connection with the litigation with this suit, attorneys have been employed, and while the services have not yet all been rendered, that an allowance for attorneys' fees should be made commensurate with the amount of services rendered, of at least $750.

"The indebtedness for which the trustee holds the five notes secured by what is called the second mortgage, being second on 5,300 head of 2 year-olds, and first on 1,100 head of yearlings, remains unpaid, as follows:

| | |
|---|---|
| Jones | $ 5,012.31 |
| Wade | 2,746.19 |
| Aetna National Bank | 1,391.00 |
| Total | $ 9,149.50 |

"Each of which sums must be computed with interest as named in the notes.

"The Fish & Keck company have paid on the indebtedness for which these notes are held, as follows:

| | | |
|---|---|---|
| Wade ....................................... | $1,119.55 | |
| Aetna National Bank............ | 1,934.54 | |
| Aetna National Bank............ | 1,000.00 | |
| Fifth note ......................... | 3,577.92—$ 7,632.01 | |
| Barth note in the sum of | | 2,639.18 |

Total, without interest......................... $10,261.19

"With reference to the Fish & Keck company's account of sales of cattle:

| | |
|---|---|
| August 14, 303 head............................... | $ 4,582.70 |
| August 31,   59 head............................. | 1,100.75 |
| September 4, 294 head............................ | 4,287.70 |
| September 26, 1893, 240 head................... | 3,389.85 |
| October 17, 1893, 24 head......................... | 619.44 |
| November 2 and 4, 29 head and 1 head .......................... .............................. | 449.92 |

Making a total of.................................... $14,430.36

"The last three items must be dropped from the account upon any theory of the testimony. The 240 head were 4 or 5 years, and the 24 and 29 and 1 head were bulls and cows.

VII.    "The court finds that the cattle named as 29 head, 24 head and 2 head were bulls and cows, and are not covered by the mortgages in question, and that no account should be taken thereof, and  the amounts should be left out of the account.

"Refused; excepted to.

"A. G. C. BIERER, Judge."

Thereafter, and on the 31st day of August, 1897, the court made the following order that:

"Now, on this 31st day of August, 1897, said cause comes on for the decision of the court upon the questions reserved under advisement by the court; the plaintiff appeared by A. A. Byers, his attorney, and the de-

fendant appearing by Asp, Shartel & Cottingham, his attorneys. And the court being fully advised in the premises finds that said plaintiff is chargeable with, accountable and liable for, the said sum of $10,367.12. That said defendant is accountable in this action for the said sum of $8,758, and is entitled to be credited in this action 'with one half of the aggregate of the two sums last named, and in the sum of $9,562.56, and that said defendant is entitled to recover of and from said plaintiff the sum of $804.56; the court therefore finds on the issues joined in said cause in favor of the defendant and against the plaintiff, and assesses the amount of the recovery of the said defendant at the sum of $804.56. To which said finding, and each and every part thereof, the plaintiff duly excepted and excepts.

"A. G. C. Bierer, Judge."

The findings of the court were in substance, that the Fish & Keck Commission company had received enough of the cattle before the trustee commenced to act in the premises to fully discharge and satisfy the mortgages of July 29, 1893; and that in addition to the amount due to the defendant on account of cattle which he had purchased, had also received the sum of $14,368.21; that proper allowances in the sum of $4,001.09 should be allowed to him for expenses; and that there remained in his hands the sum of $10,367.12 to be applied upon the mortgage of August 12, 1893, which was given to secure the debt of $40,000, one-half of which was due to the defendant, making the total fund, including what the trustee had in his hands and the amount due from Herard of $19,125.12, of which the court held the defendant, Herard, to be entitled to one half, and deducting the amount due from him to the trust, rendering judgment in his favor for the defendant of $804.56.

Opinion of the court by

McATEE, J.:    Among the questions raised by the assignment of errors are, that the trial court should not have admitted the counter claim of the defendant; that it had no power to order an accounting by Wyman, as trustee; that the mortgages all provide for the protection of the proceeds of the sales of cattle, which were a part of the trust estate; that there could be no accounting until the proceeds, after deducting the expenses, became available; that the beneficiaries in the trust were the unpaid note holders comprehended in the second mortgage, and the other note holders and beneficiaries, along with the defendant in the third mortgage; that the court was without jurisdiction of the subject matter of the trust, or of the parties necessary to a settlement of the trust, and that the remedy by counter-claim could only be invoked in behalf of the defendant in a case in which a several judgment might be had in an action arising out of the contract of transaction set forth in the petition, as the foundation of the plaintiff's claim, or connected with the subject of the action, and that this was not such a case.

In support of this position the defendant cites *Lyman v. Stanton*, 40 Kan. 727, a case brought before a justice of the peace in Shawnee county to recover money only, and in which the defendant availed himself of a counterclaim involving the foreclosure of a mortgage and the sale of real estate, and the cause having been removed to the district court and a demurrer filed to the alleged counter-claim, on the ground that the land claimed by the defendants was in Butler county, the supreme court held that the counter-claim was not proper, be-

cause the action was an action brought for the purpose of foreclosing a mortgage upon real estate situated outside of Shawnee county, and that the counter-claim ought to have been brought, under the provisions of the Code, in Butler county.

*De Ford v. Hutchinson*, 45 Kan. 318, is also relied upon. The case was replevin, for the mortgaged property. The defendant answered by general denial, averring that the plaintiff had purchased the mortgaged goods from her; that an inventory and appraisement had been made under this purchase, and the value of the goods ascertained, and that thereupon the plaintiff refused to carry out his agreement. The case was tried to a jury, which found for the defendant. It was contended by the plaintiff, upon appeal, that the defense set up by the defendant was in the nature of a counter-claim, and that as such, it could not be sustained, because it did not relate to the transaction and "subject of the action" set out in the petition in replevin.

The court sustained the contention of the defendant and her right to set up her counter-claim, and sustained the judgment below. Thereafter, upon a rehearing by the supreme court of Kansas, (reported in 26 Pac. Rep. 60,) the supreme court simply said that they thought it was necessary to eliminate any reference to the counter-claim or set-off, and that the defendant had successfully maintained the sale of the goods from herself to De Ford, and had the right to recover a judgment against him. No reason is given by the supreme court, upon rehearing, for eliminating the counter-claim and, inasmuch as the defendant had filed a general denial in the cause, and under that general denial had shown that

the plaintiff was indebted to her, as the jury found, that
it was manifestly not necessary that the court should
determine in that case that the defendant had any right
to prove a counter-claim under a general denial. The
case has no force in support of the plaintiff's argument.

In the case of *Taylor v. Matteson*, 56 N. W. Rep. 829,
a stockholder of the Hudson Lumber company had sued
another stockholder of the same company, upon account
of a liability incurred by him in signing one of the ob-
ligations of the corporation, and in which a counter-
claim was alleged, based upon mismanagement by the
plaintiff of the affairs and business of the corporation,
it was very properly held by the court that in such an
action it was impracticable and unreasonable to at-
tempt to adjust the claims of the Hudson Lumber com-
pany, the corporation, against the plaintiff and to wind
up its affairs and take an accounting of its assets in
that action, which was a purely legal action between
individual stockholders.    The case furnishes no light
upon the contention here.

Several other cases are cited from different states,
but they are either under different codes of practice or
not parallel as to facts.

Our Code of Civil Procedure provides, in sections 94
and 95, p. 779, that: "The defendant may set forth in
his answer as many grounds of defense, counter-claim,
set-off and for relief as he may have, whether they be
such as have been heretofore denominated legal, or
equitable, or both," and that the counter-claim must be
one in which a several judgment might be had in an ac-
tion arising out of the contract or transaction set forth
in the petition as the foundation of the plaintiff's claim,

·or connected with the subject matter of the action, and that, "The right to relief * * must be a right to relief necessarily or properly involved in the action for a complete determination thereof, or settlement of the question involved therein."

For convenience, the mortgages which are most material to the discussion here may be designated as the "first mortgage," by which is intended the mortgage dated July 29, 1893, by which the plaintiff was first constituted trustee for the note holders of the preceding mortgages and which amounted in all, up to that time, and as included in that mortgage, to the sum of $29,000; the mortgage of the same date, made to the Fish & Keck company to secure the payment of five notes of varying amounts, making the total sum of $19,510.72, and including 1,100 head of steers 1 year-old, may be designated as the "second mortgage;" and the mortgage dated August 12, 1893, to secure the payment of $40,-000,—$20,000 of which was due to the defendant upon a promissory note given by Baird & Ingram to Fish & Keck company, and by them assigned to the defendant, may be designated as the "third mortgage."

The subject matter of the action is the recovery from the defendant of the remnant of the cattle sold to him by contract of May 13, 1895, upon which this suit was brought.   The cattle thus sued for were all admittedly included in each of the three mortgages, and while Wyman, as trustee, was conceded to be the legal owner of the cattle, he was such only as trustee holding them for the purpose of converting them into money and applying the

proceeds on the indebtedness to the first, second and third mortgages in their proper order, and those who owned and had paid for the notes protected by these mortgages; that the beneficiaries of the trust, and each of the beneficiaries, the defendant with the rest, had a right to see to it that the cattle were so converted according to fixed legal principles, and according to a priority which the trustee had no power to vary, diminish or relinquish. The beneficiaries of the first mortgage had a fixed legal right to the conversion of the cattle and the payment of their claims. The beneficiaries of the second mortgage had likewise a fixed right to a proportion of the proceeds and the liquidation of their claims in proper order; and while the mortgage under which the defendant claims was third and last in order and point of time, the rights of the creditors under that mortgage were equally fixed upon the same security in all respects, except that they were subordinate to the prior securities; and the interest of the defendant as having a fixed interest in the cattle, and an equal right to have that interest protected, adhered to the subject of the action, as did the rights of either of the mortgagees in the preceding mortgages. He had a right to assert his legal and equitable claims as against the trustee wherever he might find him. It cannot be said successfully, that the court here was without jurisdiction of the parties necessary to a settlement of the trust.

After enumerating the county in which various actions should be brought, our Code of Civil Procedure declares, in section 55, that: "Every other action must be brought in the county in which the defendant, or

some one of the defendants, reside or may be summoned."

And it was said in *Massey v. Watts*, 6 Cranch 160, by Chief Justice Marshall, that in "cases of fraud, of trust or of contract, the jurisdiction of a court of chancery is sustainable wherever the party be found" even "although lands not within the jurisdiction of that court may be affected by the decree."

And it was said in *Le Breton v. Superior Court of San Francisco*, (Cal.) 4 Pac. Rep. 777, that when the suit is brought to reach personal property in the hands of the trustee, that that fact alone will give the court jurisdiction.

And it was said in *Penn v. Baltimore*, 1 Vesey 444, that the foundation of this doctrine is the jurisdiction of the court over the person, which was originally the only jurisdiction of courts of equity.

And in *Taylor v. Stowell and Others*, 4 Metc. 177, it was held that where the existence of any extraneous fact is shown, calculated to defeat or impair the efficacy of the legal remedy, such as the insolvency of the plaintiff or his assignors, the jurisdiction of the chancellor, even in cases of unliquidated damages, was unquestionable.

And there would seem to be no room to raise that question, since the trustee has himself come voluntarily within the jurisdiction, seeking the exercise of the powers of the court in his own behalf, and has submitted himself and the matters of his trust, including the subject of the action, to the direction and determination of the court.

The bare statement of the declarations of the Code
of Civil Procedure upon the subject of the proper prov-
ince of the counter-claim and the statement of the
matter involved in this action, that is, a contention be-
tween the plaintiff and the defendant for the proceeds
of cattle covered by mortgages of which the plaintiff is
trustee and in which the other is the beneficiary, all
secured upon the same subject matter, would seem to
require no exposition or reinforcement from authority;
but authorities abound upon the question.

It was held in *Cragin v. Lovell*, 88 N. Y. 258, in *Tay-
lor v. Mayor*, 20 Hun. 292, and in Missouri in *Halzbauer
v. Heine*, 37 Mo. 443, that the general test as to the ad-
missibility of a counter-claim is whether, at the time
the action was commenced, an action, legal or equit-
able, could have been maintained upon the counter-
claim, against the plaintiff.

And it was said in *Waddel v. Darling*, 51 N. Y. 330,
and *Allen v. Shackelton*, 15 Ohio St. 145, that the pur-
pose of the creation of the counter-claim was to enable
parties to settle and adjust all their cross-claims in a
single action, thus avoiding a multiplicity of suits, and
often securing better justice between the parties.

And it was said in *Hicksville, etc. R. R. Co. v. L. I. R.
R. Co.* 48 Barb. 355, that a counter-claim of an equitable
nature may be interposed, although the claim or de-
mand mentioned in the petition is purely of a common
law nature, or for the recovery of money only.

And it was said in *Tinsley v. Tinsley*, 15 Mon. B. 424,
that it was not necessary that the counter-claim itself
should be founded in the contract, or arise out of the

contract set forth in the petition, but that it was sufficient if it arose out of a transaction set forth therein, or was in some way connected with the subject of the action.

It was said in *Williams v. Boyd*, 75 Ind. 286, that it was sufficient if there was some legal or equitable connection between the matters pleaded as a counterclaim and the matters alleged in the original complaint, and the words "subject of the action" have been construed to mean the subject matter in dispute, as was said in *Chamboret v. Cogney* 41, How. Pr. 125; or a violated right, as was said in *Glenn Falls Mfg. Co. v. Hall*, 61 N. Y. 226.

And it was held in *De Ford v. Hutchison*, 25 Pac. Rep. 645, that:

" 'It secures to the defendant the full relief which a separate action at law, bill in chancery, or a cross bill would have secured to him on the same state of facts.' (*Woolen Mills v. Bull*, 37 How. Pr. 301; *Gleason v. Moen*, 2 Duer 642.)   *   *   'And for unliquidated damages arising on contract, different from the contract on which the action is brought,' (*Lignot v. Redding*, 4 E. D. Smith, 285,) and of an equitable or legal nature.' (*Woolen Mills v. Bull*, 37 How. Pr. 301; *Currie v. Cowles*, 6 Bosw. 453.) 'It is not required that the counter-claim itself shall be founded in, or arise out of, the contract set forth in the petition, but it is sufficient that it arise out of the transaction set forth in the petition, or is connected with the subject of the action.' (*Tinsley v. Tinsley*, 15 B. Mon. 454-459; *Wadley v. Davis*, 63 Barb. 500; *Bank v. Lee*, 7 Abb. Pr. 372-389; *Walsh v. Hall*, 66 N. C. 233-237.")

But even if the law were otherwise, and the counter-claim an improper one, the defendant waived the ob-

jection by not demurring to the answer and the counter-claim of the defendant.

Section 89 of the Code of Civil Procedure provides the grounds of demurrer: "Fourth. That there is a defect of parties, plaintiff or defendant;" and "Sixth. That the petition does not state facts sufficient to constitute a cause of action."

It was abundantly manifest on the face of the counter-claim that other persons besides the defendant were interested in the subject of the action, and might, if the plaintiff saw fit, be brought in to participate in the disposition of the cause; and likewise, the counter-claim upon its face exhibited its exact relation to the action, and upon both these grounds, if it was intended by the plaintiff to raise them at all, it was necessary to raise them by demurrer, and if not so raised and the plaintiff waives the advantage which might accrue to him by demurrer, and replies, he cannot afterward take advantage of the fact that the counter-claim is insufficient, or that there are other parties to the action.

It was said in *Parker v. Wiggins*, 10 Kan. 425, that the plaintiff, instead of availing himself of a bar to the action on the counter-claim, provided by the code, preferred to risk a hearing upon the merits, but the court properly held that that point had been waived by neglecting to innterpose it as a defense at the proper time, and in the manner pointed out by the code. Such a defense not being upon the merits is called dilatory, and its indulgence, except at the first favorable opportunity, is not favored in law.

This point has been decided in *Zabriskie v. Smith*, 13 N. Y. 322, and in *Merit v. Walsh*, 32 N. Y. 689, so far as

the same is applicable to a petition, and we think the same rules are applicable to a counter-claim set up by way of answer, that govern a demurrer to a petition.

And the declaration in the syllabus was that, where there is a defect of parties apparent on the face of the petition or counter-claim, the defect must be taken advantage of by demurrer, and if not so apparent, the issue must be made by answer or reply, and if not made in these ways, it is waived. (*State v. Sapington*, 68 Mo. 455.)

And this declaration of law was sustained in the case of *Walker v. Johnson*, 26 Minn. 147, 9 N. Y. Rep. 632, even upon a counter-claim which the supreme court held was improper; and in the trial court, the court having instructed the jury to disregard the claim asserted under the counter-claim, the supreme court reversed this ruling, saying that:

"This was error. The cause of action alleged in the answer being in no way connected with the subject of plaintiffs' action, was not proper matter of counter-claim. But the only way to make the objection that a cause of action alleged as a counter-claim is not the proper subject of counter-claim in the particular action, is by demurrer. If plaintiff omits to demur on that ground, and takes issue upon the facts alleged, he waives his objection to the character of the cause of action as a counter-claim in that action, and consents that it may be tried and determined as if it were proper to plead it as a counter-claim."

And this position was further affirmed by the same court in the case of *Lace v. Fixen*, 39 Minn. 46, 38 N. W. Rep. 762, in which in his reply the plaintiff undertook

to object to the admission of a counter-claim advanced in his answer by the defendant, the court saying that:

"It can require no argument to show that this so-called 'counter-claim' had no proper place in the case, and ought not to have been allowed to remain in it, had it been properly and reasonably objected to. The proper way to raise the question whether a cause of action is the subject of a counter-claim, is by demurr r. (*Campbell v. Jones*, 25 Minn. 157.) By failing to demur on this ground, the plaintiff waived all objection to the answer as a counter-claim. (*Walker v. Johnson*, 28 Minn. 147; 9 N. W. Rep. 632.) Counsel asks us to reconsider our former decision on this point, but, after an examination of all the authorities cited by him, we see no reason to change our views. The reasoning of the court in *Ayers v. O'Farrell*, 10 Bosw. 143, cited by us in *Walker v. Johnson*, although not the opinion of a court of last resort, strikes us as sound and convincing. We think confusion has some times arisen by failure to distinguish between a case where the 'counter-claim' fails to state a cause of action and a case where, although it states a good cause of action, it is one which is not the subject of counter-claim under the statute. Of course, in the first case the defect can be taken advantage of at any time, even after judgment, precisely as if it were set up in a complaint. Neither do we think that the attempt of plaintiff to save the point in his reply can avail him. A party cannot both answer and demur at the same time, and *a fortiori* he cannot insert a demurrer in the form of a protest in the body of an answer."

And it was said in *Taylor v. Stowell and others*, 4 Metc. 177, that: "The objection of the answer for the want of parties not having been taken in either of the modes prescribed by the Code, it was waived."

It was said by the supreme court of Missouri in the case of *Mechanics Bank v. Gilpin*, 16 S. W. Rep. 534, upon

statutes which provide, like ours, that: "A defendant may demur to the petition when it shall appear upon the face thereof: * * Fourth. That there is a defect of parties, plaintiff or defendant," and by another section, that: "When either of the orders specified do not appear upon the face of the petition, the objection may be taken by answer; and, if no such objection be taken either by demurrer or answer, the defendant shall be deemed to have waived the same, excepting only the jurisdiction of the court over the subject matter of the action," etc. The holding of the court was that where a defect of parties plaintiff appears on the face of the petition, it will be deemed waived, under those statutes unless a demurrer is filed.

And it was said by the supreme court of the same state in *Boland v. Ross et al.* 25 S. W. Rep. 524, that where a petition by one partner for relief, because of the alleged destruction of the partnership property fails to state ground for equitable relief against some of the defendants, an objection to their joinder must be taken by demurrer.

And in *Loufer v. Stottlemyer*, 44 N. E. 1008, the supreme court of Indiana, upon reference to many cases in that state, held that: "A defect of parties, if apparent on the face of the pleadings, is waived by failure to demur on that ground."

And generally, the statement of law as made in the Encyclopaedia of Pleading and Practice, vol. 6, p. 375, is that: "The objection that there is a defect of parties must be taken by demurrer at the proper time, when the deficiency appears upon the face of the record, or it will be waived. And the rule applies equally whether the

defect is one of parties plaintiff or of parties defendant."
A multitude of authorities is cited to the proposition,
including among others, decisions from the supreme
courts of Kansas, California, New York, Wisconsin, Min-
nesota and Nebraska.

Mr. Justice Story, in his work on Equity Pleading, sec-
tion 543, said that:

"A demurrer for want of necessary parties must show
who are the parties, from the facts as stated in the bill;
not, indeed, by name, for that might be impossible, but
in such a manner as to point out to the plaintiff the ob-
jection to the bill, and to enable him to amend it by
making proper parties."

No demurrer was filed, and the solitary statement in the
reply, upon which any objection can be founded to the
jurisdiction of the court or to defect of parties, or that
the court was without jurisdiction of the subject
matter of the trust, is the averment of the reply,
that "the defendant ought not to have and main-
tain his alleged counter-claim herein, upon his amended
cross-petition for an accounting, for the reason that, in
order to make such an accounting, it is necessary for the
money due plaintiff, as trustee, from the defendant, to
be entered and considered therein, and the respective
portions of the beneficiaries under said several deeds of
trust ascertained.    None of these beneficaries are parties
herein, nor are they necessary parties in this action."

This discussion and citation of authorities has been
thus extended, because of the strenuous urgency of the
plaintiff's brief that the court is without jurisdiction of
the subject matter of the trust, and that there is a defect
of parties, but it is manifest, from the solitary averment

of the reply upon which the plaintiff's contention must stand, that he has not only waived the defect of parties, if any, by failure to demur or to set up the defect in his pleading, but that he has expressly waived it, if it had been a defect, and that the averment which is intended to cover and exclude the jurisdiction of the court upon the subject matter of the action, goes no farther than an objection to the court making a final determination of the matter, if it should be found, upon examination, that this was impossible, by reason of the absence of the several other beneficiaries from participation in this cause.

And the trustee may invoke the presence of the beneficiaries in the trust, or dispense with their presence, as parties, since the rule that the beneficiaries, if their interests are involved, should be before the court, is one which has been established for the protection of the trustee, and in order to avoid the repeated vexation of the trustee of a multiplicity of suits.

It was said in Perry on Trusts, section 881, that: "The trustees ought not to be twice vexed where it is possible to determine all the rights of the parties in one suit."

It was argued by the plaintiff that the judgment of the court that, upon the sale of cattle the proceeds were *eo instanti* a payment of the notes secured by the first and second mortgages; and that the liability under those mortgages was extinguished to the extent of such proceeds was erroneous; and that in fact the relation of Fish & Keck company to the transaction, as expressed in the trust deed of July 29, 1893, and in the assignment of the second and third mortgages, was nothing more than

that this corporation was designated as the factor or com-
mission merchant for the disposal of the cattle that were
to be marketed from time to time, and that there is abso-
lutely nothing in the contracts which create it the com-
mon agent of both parties.

It is also argued, in support of this contention, that
unless expressly stipulated, an agent cannot represent
both parties; that if there was any misappropriation of
the proceeds, the note holders cannot be held bound
thereby on any theory of agency, nor can they be held
to have sacrificed or lost any part of their security, for
the obvious reason that their mortgages covered all the
cattle, and they were entitled to the security afforded by
the lien until it was fully paid; and that, inasmuch as
sales were made by the Fish & Keck company before the
maturity of any of the notes, that therefore the prior
mortgages ought not to be bound by an interpretation
of the law which shall hold that they have received pay-
ment so far as this defendant, one of the beneficiaries un-
der the third mortgage, is concerned, and that, inasmuch
as the money came into the hands of the factor before the
notes were due, that that fact would preclude the appli-
cation of the receipts then had from operating by law,
as a payment of the notes.

But this is not, we think, the correct view.    It is true
that Fish & Keck company were agents, in a certain
general sense, of the mortgagors, but they were agents
limited by the terms and conditions of their appointment.
They were factors for the selling of the cattle mortgaged,
appointed by the mortgagors and accepted by the mort-
gagees, and when the various notes under the several
mortgages having been taken from Baird & Ingram by

Fish & Keck company, and subsequently negotiated and assigned by that corporation, they carried with them to the assignees respectively such rights as had been stipulated for by the mortgagors in the execution of the mortgages, and such as had been accepted by the mortgagee, the Fish & Keck company, and no 'other or further rights than those which had been made by the mortgagors, on one side, and had been accepted by Fish & Keck company, mortgagees, on the other.

One of these stipulations was that the cattle "should be kept upon the range in the Indian Territory until the maturity of the notes, unless sooner marketed, with the consent of the trustees, and when marketed, if the notes shall not be fully paid, said cattle shall be shipped and consigned for sale to said Fish & Keck Commission company. * * And the proceeds of such sale shall be applied to the payment and discharge of all of said notes remaining unpaid, and in the order of priority as hereinbefore stated."

We think the court below properly held that, inasmuch as this trust mortgage so provided, and the notes were taken by the respective assignees with full notice of it, and the security contained in the respective mortgages was encumbered with this provision, that the cattle should be shipped to the Fish & Keck company, and that the proceeds of such sale should be applied to the payment and discharge of all said notes remaining unpaid in the order of priority, that the note holders who took the assignment of the subsequent notes and mortgages, had a right to have the proceeds of the sale of the cattle so applied, and that, if the proceeds should be misapplied by the commission company, that yet, the law would

make the application "in the order of priority" as provided in the trust mortgage. Similar provisions have been frequently interpreted by the courts, and uniformly, so far as we have been able to find, as the trial court determined in this cause.

It was said in *Hunt v. Newer*, 32 Mass. 504, that it was a general rule that where collateral securities were received for a debt, with power to convert the security into money, this is specifically applicable to the payment of such debt, the same person has the power to pay and receive, no act is necessary, and the law makes the application; if the proceeds equal or exceed the amount of the debt, it is *de facto* paid; no action would lie for it, and proof of these facts would support the defense of payment.

It was said in *Weill v. First Natl. Bank of Wilmington*, (N. C.) 11 S. E. Rep. 277, in a case in which a mortgage had been given by a firm to secure promissory notes and the mortgaged property delivered to one of the firm, as agent of the mortgagee, who was authorized as such agent only to sell and dispose of the property and appropriate the proceeds of the sales to the payment of the notes, that the mortgage was discharged upon a sale of sufficient of the property by the agent to satisfy the notes, whether the proper credits were entered or not, and the money having been so received, the contract at once appropriated it.

And in the case of *Conkling v. Shelly*, 28 N. Y. 360, which is strongly in point, the court said that:

"But the supreme court ordered a new trial in this case, on the ground that the sales made and proceeds

received by the mortgagors, under such an arrangement between them and the mortgagees, should have been applied in payment and satisfaction of the mortgage, whether the money was actually paid over to the mortgagees or not.    In this I think they were right.    Such an agreement made the mortgagors agents of the mortgagees.    It was as if the latter had taken possession, and placed a third person in charge as agent to sell and account to them.    They could not have escaped from crediting on their indebtedness the proceeds of sales made by such an agent, because he had fraudulently or dishonestly misapplied or employed the money.    *    * It is not a question between the mortgagees and the mortgagors, who of course could not take advantage of their own wrong, and who remain liable to the plaintiffs for the money received and misapplied by them.    But the question here is between the mortgagees and other creditors who have obtained a lien or an interest in the mortgaged property after the satisfaction of the mortgage.    The mortgagees have made the mortgagors their agents, and their dealings with the property, under the agreement constituting them such, must be considered as the acts of agents, and not of mortgagors, and will affect their principals accordingly.    The moneys received by them from sales were in legal effect received by the mortgagees.    (*Carter v. Stevens,* 3 Denio, 33; *Bragalman v. Daue,* 69 N. Y. 69; *Hunt v. Nevers,* 15 Pick. 500.)    It clearly appears from the facts found by the court that the agent of the defendant sold the mortgaged property, and received the money therefor, greatly more than sufficient to pay the mortgage debt, and thus, as we have seen, it was, in legal effect, discharged.    The defendant must be treated as having received the money through its agent."

And it was said by the same supreme court in *Brackett v. Harvey,* 91 N. Y. 215, that: "This case went upon the ground that such sale and application of proceeds is

the normal and proper purpose of a chattel mortgage, and within the precise boundaries of its lawful operation. It does no more than to substitute the mortgagors as the agent of the mortgagee, to do exactly what the latter had a right to do and what it was his privilege and duty to accomplish. It devotes, as it should, the mortgaged property to the payment of the mortgaged debt."

And further that: "If the mortgagor sells and actually pays over the whole proceeds, nobody is harmed, for that only has happened which is the proper and lawful operation of the mortgage. If, on the other hand, such proceeds have not been paid over, the adverse lien is still unharmed, for as against it such proceeds are deemed paid over and applied in reduction of the mortgage debt, although as between the mortgagor and mortgagee the debt remains and is still unpaid."

And this doctrine is affirmed in Jones on Chattel Mortgages, section 401, with the statement that: "As against an adverse lien, the proceeds of mortgaged goods received by the mortgagor, under an agreement allowing him to sell for the mortgagee's benefit, are to be deemed to be applied to the payment of the mortgage debt, and then it is impossible that any fraud or injury to another can be imputed to such an agreement."

And after citing the New York cases, as above, the supreme court of South Dakota, in *Davenport v. C. B. & N. R. Co.*, 45 N. W. Rep. 215, said that: "This doctrine seems so obviously well founded in reason, and has been so often recognized and followed in other states, that its adoption by this court needs no further justification than a reference to the following cases, in addition to the New York cases before noticed." * *

We must, therefore, conclude that when the mortgaged cattle passed into the hands of Fisk & Keck company as factors for their sale, under the provision of the mortgages, that the proceeds were immediately, and by operation of law, applied to the discharge of the mortgage liabilities in their priority.

It is, however, argued by the plaintiff in error that by the deposition of F. O. Fish, introduced and taken by the defendant, that the cattle, amounting upon sale to $14,-430.36, as found in the second finding of fact made by the court, were not covered by the mortgages, and that they were other cattle and of other ages.

A careful examination of Mr. Fish's testimony, as to the major portion of those cattle, does not justify this contention. Mr. Fish did not, in any instance, by any statement, commit himself to the fact that as to such major portion of such cattle included in those sales, they were not covered by the mortgage.

He says that: "On August 14 there were 303 cattle, which I judge to be threes;" on August 31 there was a sale of 59 cattle, which "I judge" to be threes, and on September 4 there was a sale of 294 cattle in St. Louis, which "I judge" to be threes, and on September 26 there was a sale of 240 cattle which "I understand from Mr. Keck" were fours and fives.

There is no statement in Mr. Fish's testimony stronger than these statements, concerning those cattle. His statement that "I judge" over and over again has no further weight than the statement of a guess. It is certainly not a statement of knowledge, and when he says, in order to support the contention that 240 head of

cattle were fours and fives and therefore not included in the mortgage, he says only that "I understand from Mr. Keck" that they were fours and fives. This is an important item.      It involves the disposition   of   $3,389.85. The sole information upon which it is sought to divert this 240 head of cattle from the appropriation of their proceeds to the discharge of the mortgage indebtedness is upon Mr. Fish's "understanding" from Mr. Keck, and when Mr. Keck was called to testify no questions were asked him concerning these cattle or their ages.

These cattle claimed to be fours and fives, and therefore not included in the mortgage indebtedness, 240 in number, sold on September 26, 1893, at an average price of $14.12½; 294 cattle which Mr. Fish "judged" to be 3 years old, sold at an average of $14.92.   On August 21, 1893, 59 head of cattle, which he "judged" to be 3 years old, sold for an average price of $18.65, and on the 14th day of August preceding, 303 head of cattle, which he also "judged" to be 3 years old, sold for an average price of $15.12.

The inference to be drawn from a comparison of these average prices does not support the conclusion sought for by the plaintiff in error, that the 240 head of cattle sold September 26, 1893, were, in fact, 4 and 5 years old, nor are any of the statements upon which any of these cattle described by Mr. Fish and their ages, sufficient, standing alone, to support any rational conclusion at all concerning the ages of the respective lots of cattle, sold at the various dates specified.

The whole case was heard in the trial court, much of it being upon oral evidence, and we do not find in this

testimony of Mr. Fish any assertion of fact to contradict or vary, or justify us in setting aside the finding of the trial court, which should be, in our judgment, affirmed except as hereinafter excepted.

But the court also refused to find, at the request of the plaintiff in error, "that the plaintiff have credit for the amount paid upon the $5,000 note and mortgage on the 4 and 5-year-old steers, dated August 30, 1894, the amount so paid being the sum of $4,966.67," a finding upon the point involved here having also been impliedly included in the affirmative findings of fact, and this refusal also assigned for error.

The mortgage having been in fact executed, its effect and force could not have been set aside by the court, except upon the conclusion that it had been executed in fraud of the rights of creditors whose claims attached under the pre-existing mortgages which have been recited. These mortgages, as has been seen, covered and included 6,400 head of cattle, 1 and 2 years old at the time of the execution of the mortgages.

Mr. Baird, of the firm of Baird & Ingram, testified that at the time of the sale of the cattle upon the ranch of Baird & Ingram, there were about 6,500 head of cattle upon it, not according to actual count, but according to estimates made up solely from the amount of purchases which the firm of Baird & Ingram had at various times made prior thereto, and deducting therefrom the cattle which they had actually shipped into market at Kansas City or had otherwise sold, and leaving out of view entirely the losses, which appeared to have been very large, from theft, and from cattle wandering off the

range.    He testified that subsequent to that time, 400 or 500 head of cattle, that he knew of, had died.

Mr. Fish testified that at the time of the purchase of the ranch by the incorporated firm, from Baird & Ingram, that there were 6,300 head of cattle on the range, and which were the subject of the purchase.    Thereafter, in the fall of 1893, 900 head of cattle were sold from the range, which were claimed by the Fish & Keck Commission company to have been 3-year-old cattle, and exempt from the operation of the prior mortgages.

If, therefore, there had been at the time of the purchase of the Brown ranch by Fish & Keck company, from Baird & Ingram, 6,500 head of cattle upon the range, of which 900 were sold, not subject to the mortgages, there were then upon the range, to the knowledge of the parties executing the mortgages, but 5,400 head of cattle to do service for mortgages reciting that 6,300 head of cattle were upon the range. It turned out upon the final liquidation of the concern, that the total number of cattle ever found upon the range were but 3,503 head, and that its mortgage liabilities, prior to the execution of the instrument which is set up as a mortgage security for $5,000, dated August 30, 1894, was $85,000, as testified to by Ingram.

It was in this financial condition of the concern, the Fish & Keck company, that the court was asked to believe that while the cattle, 3,503 in number, of 1 and 2-year-old steers, were made by the management of the Fish & Keck company and the trustee, Wyman, to carry an indebtedness of $85,000 from July and August, of 1893, and while the Fish & Keck company were laboring in

this slough of insolvency, apparently ready and willing to mortgage everything in existence and under their control, that they had upon the Brown or Baird & Ingram range, 300 head of mature cattle, 4 and 5 years of age, bearing the "Box X" brand, the brand belonging to the company, which had not before been used as an instrument to obtain credit for the company.

In this condition of things the trial court found itself confronted with the fact that no positive testimony on the subject could be procured, and its opinion was, doubtless, formed from a close scrutiny and comparison of the facts testified to, and of the value and weight of the testimony of the witnesses, as the court could observe it.

And in making up its judgment upon the testimony it was compelled to observe that if there were any 4 or 5 year-old cattle upon the range at the time that the mortgage for $5,000 was executed on the 30th day of August, 1894, that they were included in the only sales which were afterwards made from the ranch, to-wit, either in the sale of December 21, 1894, of 387 head of cattle, which were sold at $19.95 each, or else in the sale of December 31, 1894, of 349 head of cattle, which were sold at an average price of $20.07 each; while at the same time, on the 7th day of August, 1894, the Fish & Keck company had sold 1,000 head of 3-year-old cattle at $20 each, and had sold, on August 30, 1894, 300 head of 3-year-old cattle at $20 each, and the inference of the court would, therefore, be that the sales of December 21 and December 31, and of August 7 and August 30, were of the same class of cattle, and that, if the cattle sold on August 7 and August 30, respectively, were

3-year-old cattle, so also were the cattle which were sold upon December 21 and December 31, of the same age and class.

It was shown in evidence that it was the duty of Mr. Fish to keep the books of the concern, and that it was the duty of Mr. Keck to manage the "outside" business, that is, to receive and make the sales of cattle. This being so, Mr. Fish testified upon the whole business, so far as he was examined, and speaking of the various sales was able to give no information, which was entitled to be considered as legal evidence, except upon a small portion of the cattle hereafter mentioned, and when asked touching the ages and these various sales of cattle, he answered invariably that "I judged" and that "I understand from Mr. Keck" that the cattle were of a certain age. Mr. Keck also appeared upon the witness stand, had seen the cattle, sold them, had personal knowledge of them, and did not testify concerning them at all.

Mr. Ingram had gone out of the firm at the time of the sale of the cattle to the Fish & Keck company; Mr. Baird had died about the 1st of November, 1894; Mr. Fish had no knowledge of the matter; Mr. Keck was the only person living, apparently, who could testify positively as to the ages of the various shipments of cattle sold by him as the "outside" representative of the Fish & Keck company, and yet he was not asked a single question upon and did not testify upon, the point.

In addition to these facts, the sales of cattle were all credited upon the general account of the Fish & Keck Commission company, which included all of the indebtedness represented by the notes and secured by the mort-

gages executed prior to August 30, 1894.    The 300 head
of cattle claimed to have been mortgaged as "fours" and
"fives" under the mortgage of the last named date, were
never at any time attempted to be segregated, if such cat-
tle were in existence or ever entitled to be segregated,
from the other cattle on the range, neither on the range,
nor in shipments, nor in sales, nor in the accounts of the
company, but the sales of December 21 and December 31,
1894, in which those 300 head of four's and five's, if such
cattle were in existence, must have been included, were,
as to previous sums of money received from the sale of
cattle upon the Brown range, merged in the general mort-
gage account of the Fish & Keck company, which
included on the other side of the account all the liabilities
set out and represented in these proceedings. We have
examined the record carefully; the whole management of
the business indicates, as these facts indicate, that the
finding and conclusion of the trial court was correct.

Such a finding must have been forfeited by the conduct
of the trustee.    It was Wyman's duty to have taken
charge of these cattle immediately upon the execution of
the first trust deed, and upon his acceptance of the trust,
and to have seen that the cattle covered and secured by
the mortgages should be applied to the payment of the
mortgage debts created and secured by them.

The plaintiff Wyman was first appointed trustee in the
mortgage of July 23, 1893.    He accepted the trust, but
he took no share in the management, took no possession
of the ranch, exercised no supervision of the sales, and
did not commence the active discharge of his duties under
the trust until November, 1894. In the meantime $40,-

667.28 in value of the property from the Brown ranch and of the Baird & Ingram cattle were sold by the Fish & Keck company. Concerning these acts he seemed to have paid no attention, made no inquiries, demanded no account and knew nothing of the management of the concern or the disposition of the porperty.

The mortgages or deeds of trust under which he was appointed and which he accepted were, so far as he was concerned, no more than cloaks to deceive creditors.

It was said in Perry on Trusts, that: "When trustees have accepted the office, they ought to bear in mind that the law knows no such person as a passive trustee, and that they cannot sleep upon their trust;" that they should make themselves "acquainted with the nature and circumstances of the property," and that if "a loss occurs from any want of attention, care or diligence in him after his acceptance, he may be held responsible for not taking such action as was called for," and that "he is bound to discharge his duties," and that "he will be responsible for any mismanagement," that "the first duty of a trustee, after his appointment and qualification to act, is to secure the possession of the trust property, and to protect it from loss or injury;" that "a trustee must use the same care for the safety of the trust fund, and for the interests of the *cestui que trust*, that he uses for his own property and interests," and that he "will be responsible for any loss that may occur to the trust fund." (Perry on Trusts, secs. 401, 438, 441 and 444.)

It is manifest that the trustee wholly failed to discharge any of the duties of his trust until November, 1894, according to his own account.

It is shown in the evidence that he did not pretend
to take possession of the range until after the death of
Baird, or sixteen months after he had himself accepted
the trust. He accepted the trust in July, of 1893, and
took charge of the range and of the subsequent sales
from it in November, 1894. All of the notes which, after
the acceptance of the trust, it became his duty to see
paid, had matured for more than a year before he took
control of the trust property.

The 300 head of cattle covered by the mortgage of
August 30, 1894, if they were in existence at the time of
the execution of the mortgage, and there is no evidence
that they were, were by him permitted to become inex-
tricably confused with all the other cattle sold from the
range, and having been thus mingled with the trust
property, it became his duty to point out to the court
clearly and satisfactorily the identical property which
was covered by his trust, and that which he claimed to
be not so affected, so that the court might, by a proper
order, be able to clearly distinguish that which was trust
property from that which was not. This was not done.
But, on the contrary, the court would have been justified
by the condition of the evidence, in concluding that, in-
asmuch as the mortgage of August 30, 1894, was exe-
cuted between the persons 500 miles from the range
where the cattle were, who had no knowledge of their
condition or of whether there were any such number of
4 and 5-year-old cattle on the range or not, after all the
other cattle of supposed less market value had been mort-
gaged for much more than all they were worth, for more
than a year previous to that time, and that the mortgage
was executed solely as a cover and pretext for taking

out the sum of $5,000 from the trust fund and applying it to other purposes, for which there was no proper justification, and that there were, in fact, no such cattle.

There having been evidence in the case to reasonably support the findings of fact made by the trial judge, it will not, upon this subject, be disturbed here.

As has been shown, the plaintiff in error requested the court below to make special findings of fact. This request resulted in a careful and elaborate "findings of fact," as they appeared to the court.

At their conclusion, and upon the 12th day of August, 1897, the plaintiff filed his motion in the court to set aside the findings of fact as made by the court and his exceptions thereto, and also made a special request for findings of fact. The motion to set aside was overruled, and the findings of fact were refused.

And thereupon, on August 26, 1897, the plaintiff again made request for special findings of fact, which was refused, and thereupon, on August 26, 1897, the plaintiff filed his motion, dated August 23, 1897, to "dismiss his action herein without prejudice to another suit." Thereupon the court proceeded to enter judgment on August 31, 1897. This is assigned as error, the plaintiff in error claiming that upon the filing of his motion to dismiss the cause, it became immediately effective, and that the cause was no longer in court for consideration.

Under similar circumstances, plaintiff in *Oberlander v. Confrey*, 28 Kan. 462, made a like motion, upon a Code of Civil Procedure whose provisions have been

adopted here. It was there held, that: "Dismissals under the civil code are judgments, which neither of the parties, nor the clerk, nor all together, but only the court, can render," and that, " A plaintiff, without any order or judgment of the trial court, cannot actually dismiss his case from the court."

But our Code of Civil Procedure, section 411, Statutes of 1893, provides, that: "In any place where a set-off or counter-claim has been presented, the defendant shall have the right of proceeding to the trial of his claim, although the plaintiff may have dismissed his action or failed to appear."

And it was, therefore, not erroneous for the court to proceed to a final determination of the matter upon the petition and counter-claim.

We find, however, that in the second finding of fact, the trial court has included the following items: October 17, 1893, 24 cattle, sold for $619.44; November 2, 1893, 29 cattle, sold for $439.07.

The only testimony given upon the case touching these items was that of Mr. Fish, who says that "they were bulls and cows." Bulls and cows are not covered by a mortgage which undertakes to include only 1 and 2-year-old steers. This finding was therefore error, for which the case should be reversed. The total sum of these sales amounted to $1,058.51, and the cause is remanded, with direction to the trial court to give to the plaintiff in error credit for this sum, and to reform the final judgment of the court of August 31, 1897, and to make the same state that "the said plaintiff is chargeable with,

Wyman v. Herard.

accountable and liable for, the sum of $10,367.12, less the sum of $1,058.51, or, to-wit, the sum of $9,308.61. The said defendant is accountable in this action for the said sum of $8,758, and is entitled to be credited in this action with one-half of the aggregate of the two sums last named, that is, the sum of $9,033.30, and that the defendant is entitled to recover of and from the plaintiff the sum of $275.30; and that the court, therefore, finds on the issues joined in said cause in favor of the defendant and against the plaintiff, and assesses the amount of the recovery of the said defendant at the sum of $275.30." With this exception the judgment is affirmed, since we find no other error in the record.

All of the Justices concurring.