**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 20 1998**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

BRANSON SCHOOL DISTRICT RE-82,
PRITCHETT SCHOOL DISTRICT RE-3,
SPRINGFIELD PUBLIC SCHOOLS
DISTRICT RE-4,

     and

KANDACE SUE SPURLING and
BROOKE ILENE SPURLING, by and
through their parents, DAVID EARL
SPURLING and LONA SUE SPURLING,

     Plaintiffs-Appellants,

v.

ROY ROMER, Governor of the State of
Colorado,

     and

ROBERT MAILANDER, THOMAS W.
SWANSON, and CHARLES A. VIDAL,
in their official capacities as members of
the Colorado State Board of Land
Commissioners,

     Defendants-Appellees,

---

CITIZENS TO SAVE COLORADO'S
PUBLIC TRUST LANDS, INC.,

     Amicus Curiae.

No. 97-1158

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 96-B-2979)**

Evan S. Lipstein, of Lipstein & Mortimer, Denver, Colorado (Charles E. Mortimer Jr., of Lipstein & Mortimer, and John Berry, with him on the briefs), for the appellants.

Patricia S. Bangert, Director of Legal Policy, Colorado Department of Law (Gale A. Norton, Cheryl A. Linden, and William E. Thro, Office of the Attorney General of Colorado, with her on the brief), for the appellees.

David R. Eason, of Berenbaum, Weinshienk & Eason, Denver, Colorado, and Richard W. Daily, of Powers Phillips, Denver, Colorado, for amicus curiae CITIZENS TO SAVE COLORADO'S PUBLIC TRUST LANDS, in support of appellees.

Before **ANDERSON, EBEL** and **HENRY**, Circuit Judges.

**EBEL**, Circuit Judge.

This case presents the question of whether the voters of a state may alter the management principles guiding the state's trusteeship of public lands without violating the terms of a century-old trust established by Congress when the state entered the Union. Because we find that the recent changes made in the management of Colorado's land trust for public schools conform to the trust restrictions created by Congress in 1875, we hold that "Amendment 16" to the Colorado Constitution approved by state voters in 1996 does not violate the

- 2 -

Supremacy Clause of Article VI of the United States Constitution. Therefore, we affirm.

## Background

The origins of this dispute stretch back to the original legislation under which the Territory of Colorado entered the Union as a state. In 1875, Congress passed an enabling act that authorized the admission of Colorado upon the territory's passage of a state constitution.[1] See Colorado Enabling Act, ch. 139, 18 Stat. 474 (1875). The Enabling Act established that Sections 16 and 36 of each township[2] in the new state would be "granted to said State for the support of common schools." See id. § 7.[3] The Act also established that the two sections

---

[1]In fact, this was Congress' second enabling act for Colorado after the first effort failed to gain sufficient voter support during the Civil War and then the resurrection of the effort became embroiled in the Reconstruction cross-fire between President Andrew Johnson and the Republican-controlled Congress of the late 1860s. See Carl Ubbelohde et al., A Colorado History 134-38, (7th ed. 1995). The provision for a school land trust in this first Colorado statehood act in 1864 is less detailed than the provision that ultimately went into effect through the 1875 enabling act. See Act of Mar. 21, 1864, ch. 37, § 7, 15 Stat. 32, 34.

[2]A "township" was a 36-square mile division of land – six miles by six miles – that was the basic format for land surveying throughout the West. A "section" was a single square in that 36-square survey.

[3]The full text of § 7 of the Act provides:

> That sections number sixteen and thirty-six in every
> township, and where such sections have been sold or

(continued...)

- 3 -

"granted for the support of common schools shall be disposed of only at public sale . . . [with] the proceeds to constitute a permanent school-fund, the interest of which to be expended in the support of common schools." Id. § 14.

Within a year of the new enabling act, Colorado's leaders had convened a constitutional convention and approved the requisite republican constitution. See Carl Ubbelohde et al., supra, at 145-48. That first state constitution responded to the federal government's grant of lands for common schools by establishing a "public school fund" that would "consist of the proceeds of such lands as have heretofore been, or may hereafter be granted to the State by the general government for educational purposes," as well as all escheats and any grants to the State "for educational purposes." See 1876 Colo. Const., art. IX, § 5. Article IX of the 1876 Constitution established that this public school fund "shall forever remain inviolate and intact," and the interest from the fund "shall be expended in the maintenance of the schools of the State."[4] Id., art. IX, § 3. The 1876

_____

[3](...continued)
> otherwise disposed of by any act of Congress, other lands, equivalent thereto, in legal subdivisions of not more than one quarter-section, and as contiguous as may be, are hereby granted to said State for the support of common schools.

Colorado Enabling Act, § 7, 18 Stat. at 475.

[4]The question of how the money from the public school fund should be spent sparked heated debate at the state constitutional convention in 1876, with

(continued...)

Constitution also created a State Board of Land Commissioners to manage the federal lands that had been granted under the enabling act.  See id., art. IX, §§ 9, 10.  Furthermore, the state legislature was directed to ensure that within the earliest practicable period these land grants "shall be judiciously located and carefully preserved and held in trust subject to disposal, for the use and benefit of the respective objects for which said grants of land were made . . . ." See id., art. IX, § 10.

The State Board of Land Commissioners, like most Western states, initially pursued an aggressive policy of selling off the school-grant lands both to provide income for the state's public schools and as a means to spur settlement in the state.  See Sally K. Fairfax et al., The School Trust Lands:  A Fresh Look at Conventional Wisdom, 22 Envtl. L. 797, 807 & n.25 (1992) (noting that early in the history of the management of school trust lands in the West, where land was otherwise cheaply and widely available, holding and leasing the school trust lands was not an economically feasible option).  However, this policy gradually shifted to one of holding onto the school lands and renting them to ranchers, farmers, and other lessees.  See id. at 823-24.  By the 1990s, nearly 3 million acres out of the

---

[4](...continued)
Catholic delegates arguing that a portion of the money should be allotted to parochial schools.  See Ubbelohde et al., supra, at 147.  The convention, however, agreed to prohibit any state aid, other than property tax exemptions, for parochial or other sectarian schools.  See 1876 Colo. Const., art. IX, § 7.

original 4.6 million acres remained intact in the state's school lands portfolio. See id. at 833 (figure 1 showing that in 1990, 62% of the state's original school land grants remained in state ownership); Mark Obmascik, Use of State Land Amendment Focus, Denver Post, Oct. 6, 1996, at A1 (indicating that by 1996, the state still held 3 million acres in school lands, and the public school fund had reached $260 million in principal).

In the mid-1990s, as the land board's management policy began to shift back toward selling some of its more valuable holdings, including a few parcels regarded by some as environmentally sensitive, Governor Roy Romer and others championed a plan to overhaul the land trust system in Colorado. See Obmascik, supra, at A1. Romer and his supporters proposed what became known as "Amendment 16."

The 1996 ballot initiative presented three groups of revisions to Article IX of the Colorado Constitution, the article which deals with the federal government's grant of school lands. See Amendment 16, 1997 Colo. Sess. Laws 2399.[5] The first set of revisions set some general parameters for the use of public school funds; the plaintiffs have included challenges against a few of these

---

[5]The three sections of Amendment 16 are not numbered sequentially. Instead, the individual numbering of the ballot measure's sections corresponds to the numbering of the relevant sections in Article IX of the Colorado Constitution, i.e., § 3, § 9, and § 10.

provisions along with the main thrust of their other challenges.

The second set of revisions involves a wholesale scrapping of the old structure of the three-member paid State Board of Land Commissioners that had managed the school lands for generations. Instead, under Amendment 16, the board would be composed of five term-limited members who would serve without a salary, would have a constitutional protection from personal liability for any negligence in office, and would be selected on the basis of certain interest-group constituencies. See id. § 9.

The third section of Amendment 16 contains most of the substantive core of the ballot measure, and it is this section which has prompted the crux of the plaintiffs' challenges. The section wipes out the previous requirement that the land board manage its land holdings "in such a manner as will secure the maximum possible amount" for the public school fund. See id. § 10(1). Instead, the third section requires the new land board to manage its land holdings "in order to produce reasonable and consistent income over time." See id.

This section also provides a series of management principles to guide the land board in its activities. Some of these changes include: a requirement that the land board establish a permanent 300,000 acre "Stewardship Trust"[6] of land

_____

[6]The actual provisions require at least 295,000 acres be placed in the Stewardship Trust and no more than 300,000 acres. For purposes of simplicity,
(continued...)

determined "to be valuable primarily to preserve long-term benefits and returns to the state," and that such land be held and managed for stewardship, public use or future disposition by permitting only uses that will "enhance the beauty, natural values, open space, and wildlife habitat" of that acreage, see id. § 10(1)(b)(I); a requirement that the board manage its agricultural and natural resource holdings to promote long-term productivity and value, see id. §§ 10(1)(b)(II) & (III); and a requirement to allow school districts to lease, purchase or use the school trust's lands for new school sites at prices that may not be more than "appraised fair market value," see id. § 10(1)(e).

On Nov. 5, 1996, voters approved Amendment 16; the official vote tally was 708,502 (51.9%) in favor, and 656,095 (48.1%) against. See 1997 Colo. Laws at 2402.

Members of the coalition who had campaigned against Amendment 16 then turned to the courts, filing this suit six weeks after the election. The suit was brought in the name of three rural school districts in Las Animas and Baca Counties (the "school district plaintiffs") and two school children from Washington County (the "individual plaintiffs"), represented by their parents, who

---

[6](...continued)
we refer to these provisions as the "300,000 acre" Stewardship Trust.

alleged that they would be affected by Amendment 16.[7]  On a motion from the plaintiffs, the district court entered a temporary restraining order barring implementation of any of Amendment 16's provisions pending the results of a hearing on the plaintiffs' request for a preliminary injunction.  Following that hearing, the court dissolved the TRO and issued a preliminary injunction against only § 9(5), the provision waiving personal liability for land board members.  Following cross-motions for summary judgment and the intervention of "Citizens to Save Colorado's Public Trust Lands," the district court, in a very careful and thorough opinion, ruled in favor of the defendants, upholding the legality of Amendment 16.  See Branson Sch. Dist. RE-82 v. Romer, 958 F. Supp. 1501 (D. Colo. 1997).  On March 27, 1997, the court entered its judgment dismissing the plaintiff's suit and dissolving the preliminary injunction.  This appeal by the plaintiffs followed.

**Discussion**

We have jurisdiction to review the district court's final judgment under 28 U.S.C. § 1291.  Because this appeal from a summary judgment disposition presents purely legal questions concerning the interpretation of both state and

---

[7]The individual plaintiffs were not parties to this suit when the complaint was first filed.  However, the district court later granted a motion from the individual plaintiffs to intervene and participate in the case as plaintiffs.

federal constitutional law, we must review the district court's decision de novo. See 19 Solid Waste Dept. Mechanics v. City of Albuquerque, 156 F.3d 1068, 1071 (10th Cir. 1998) ("We review a district court's grant of summary judgment de novo."); Fletcher v. United States, 116 F.3d 1315, 1323-24, 1326 (10th Cir. 1997) (reviewing legality of Indian tribe's constitutional amendment de novo).

## I.  Standing

As this court recently reiterated, the standing of a party to bring suit in federal court is "not a mere technical hoop through which every plaintiff must pass, but rather is 'a part of the basic charter promulgated by the Framers of the Constitution.'" Utah v. Babbitt, 137 F.3d 1193, 1202 (10th Cir. 1998) (quoting Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 476 (1982)).  In this case, the defendants argue that both sets of plaintiffs – the school district plaintiffs and the individual plaintiffs – lack standing, first because the school districts, as political subdivisions of the state of Colorado, lack the legal power to sue the state, and second because both the school districts and the schoolchildren have not alleged a sufficient "injury-in-fact" under the traditional requirements of Article III.  We reject both of these arguments.

## A.  Political subdivision standing

Relying on a line of cases dating back nearly seventy-five years, the defendants contend that the school district plaintiffs have no right to invoke the power of the federal courts in this case because the school districts are mere creatures of their creating state, and as such, federal doctrines of political subdivision standing prevent them from suing their parent state.  We assume that this argument is properly presented in a case where the school districts have not sued the state of Colorado in name but rather have sued several state officials in their official capacities.  See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989) (holding that a suit against a state official in his representative capacity is considered a suit against the official's office, which "is no different from a suit against the State itself").  Nevertheless, we conclude that a political subdivision has standing to bring a constitutional claim against its creating state when the substance of its claim relies on the Supremacy Clause and a putatively controlling federal law.

It is well-settled that a political subdivision may not bring a federal suit against its parent state based on rights secured through the Fourteenth Amendment.  See City of Moore, Oklahoma v. Atchison, Topeka, & Santa Fe Ry. Co., 699 F.2d 507, 511-12 (10th Cir. 1983) (rejecting an equal protection challenge against a state statute because "political subdivisions of a state lack

- 11 -

standing to challenge the validity of a state statute on Fourteenth Amendment grounds"); see also United States v. Alabama, 791 F.2d 1450, 1455 (11th Cir. 1986); South Macomb Disposal Auth. v. Township of Washington, 790 F.2d 500, 504-05 (6th Cir. 1986); Town of Ball v. Rapides Parish Police Jury, 746 F.2d 1049, 1051 n.1 (5th Cir. 1984); Village of Arlington Heights v. Regional Trans. Auth., 653 F.2d 1149, 1152-53 (7th Cir. 1981); City of New York v. Richardson, 473 F.2d 923, 929 (2d Cir. 1973).

All of this case law emanates from two landmark Supreme Court cases in which the Court struck down constitutional challenges by two cities against their parent states. See Williams v. Mayor & City Council of Baltimore, 289 U.S. 36 (1933); Trenton v. New Jersey, 262 U.S. 182 (1923). In the earlier of those cases, the Court announced the rule that a state generally is immune to claims by its subsidiary political subdivisions asserting that the state has violated a constitutional provision protecting individual liberty: "The power of the State, unrestrained by the contract clause or the Fourteenth Amendment, over the rights and property of cities held and used for 'governmental purposes' cannot be questioned. . . . This Court has never held that these subdivisions may invoke such restraints [based on either the Contract Clause or the Fourteenth Amendment] upon the power of the State." Trenton, 262 U.S. at 188. As Justice Cardozo later explained for the Court, "[a] municipal corporation, created by a

state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator." Williams, 289 U.S. at 40.

Despite the sweeping breadth of Justice Cardozo's language, both Williams and Trenton stand only for the limited proposition that a municipality may not bring a constitutional challenge against its creating state when the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights. See Williams, 289 U.S. at 40 (involving an equal protection challenge under the Fourteenth Amendment); Trenton, 262 U.S. at 183 (involving a challenge under the Impairment of Contracts Clause of Article I and the Due Process Clause of the Fourteenth Amendment); see also Rogers v. Brockette, 588 F.2d 1057, 1068 (5th Cir. 1979) ("We think these cases [the Williams/Trenton line of cases] are substantive interpretations of the constitutional provisions involved; we do not think they hold that a municipality never has standing to sue the state of which it is a creature."). Neither the Williams/Trenton line of cases nor any other subsequent Supreme Court case has held that a political subdivision is barred from asserting the structural protections of the Supremacy Clause of Article VI in a suit against its creating state. Indeed, in a suit involving Arizona's school lands trust, the Court found no barrier to the standing of the plaintiff, who was the

commissioner of the Arizona State Land Department, to sue the State Highway Department even though the suit was "in form and substance a controversy between two agencies of the State of Arizona." See Lassen v. Arizona ex. rel. Arizona Highway Dep't, 385 U.S. 458, 459 n.1 (1967). The Court in Lassen found that the suit was properly within the jurisdiction of the federal courts because the plaintiff was "a substantially independent state officer" and was "essentially the trustee of the trust at issue here." See id.

In this case, the school district plaintiffs are "substantially independent" from the state of Colorado even though the districts owe their existence as political subdivision to the state. The districts may hold property in their own name, enter into contracts, and they have the right to sue and be sued in their own name. See Colo. Rev. Stat. § 22-32-101 (1998). The districts are led by boards that are elected independently. See id. § 22-31-105. Most importantly, the school districts are "essentially" the beneficiaries of the federal trust at issue here. The Colorado Enabling Act granted more than 4.6 million acres of school lands to the state of Colorado for the support of the "common schools." See Colorado Enabling Act, § 7, 18 Stat. at 475. Today's public school districts are the direct political descendants of those 19th Century "common schools." Thus, the school districts' status as political subdivisions does not disentitle them from bringing an action under the Supremacy Clause to enforce the terms of the Colorado Enabling

Act merely because the defendants are sued in their official capacities representing the state that created those subdivisions.

Our conclusion that the school district plaintiffs have the power to bring their federal claims against the state under the Supremacy Clause and the Colorado Enabling Act is buttressed by recent case law from the circuits. For example, in Rogers the Fifth Circuit held that a political subdivision may bring a claim against its creating state when the claim is based on an assertedly controlling federal law and where the political subdivision assertedly is a beneficiary of that federal law. See Rogers, 588 F.2d at 1069 (holding that a Texas school district had standing to sue Texas state educational authorities over the state's management of a school breakfast program regulated by federal law); see also South Macomb Disposal, 790 F.2d at 504 (acknowledging that "[t]here may be occasions in which a political subdivision is not prevented, by virtue of its status as a subdivision of the state, from challenging the constitutionality of state legislation," while holding plaintiff lacked standing because present suit predicated on Fourteenth Amendment).

This understanding of political subdivision standing seems also to have been at work in this court's own decision involving a suit between two political subdivisions in Oklahoma. See Housing Auth. of the Kaw Tribe of Indians v. City of Ponca City, 952 F.2d 1183 (10th Cir. 1991). In Kaw Tribe, we held that a

local housing authority lacked standing under the rule from <u>Trenton</u>, <u>Williams</u>, and <u>City of Moore</u>, to bring a Fourteenth Amendment claim against a local municipality. <u>See</u> <u>Kaw Tribe</u>, 952 F.2d at 1190. On the other hand, we found no similar barrier to the local housing authority's standing to sue under the federal Fair Housing Act. <u>See</u> <u>id.</u> at 1193. As a result, we reversed the district court's denial of standing for the Fair Housing Act claim. <u>See</u> <u>id.</u> at 1195, 1196. Implicit in our decision in <u>Kaw Tribe</u> is the view that the Fair Housing Act, as a federal statute, trumps any contradictory state law through the operation of the Supremacy Clause. Thus, <u>Kaw Tribe</u> supports the proposition that we make explicit today: A political subdivision has standing to sue its political parent on a Supremacy Clause claim.

The only circuit to bar Supremacy Clause challenges by political subdivisions against their parent state has been the Ninth Circuit. <u>See</u> <u>Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank</u>, 136 F.3d 1360, 1363-64 (9th Cir.) (interpreting that circuit's precedents to hold that "'political subdivisions' of a state lack standing to challenge statutes of the state itself, or one of its political subdivisions, on 'constitutional grounds,'" including the Supremacy Clause), <u>cert. denied</u>, 119 S.Ct. 173 (1998).[8] We have reviewed the

_____

[8]The Second Circuit arguably has also recognized a broad rule prohibiting a political subdivision from ever suing its creating state. <u>See</u> <u>City of New York</u>,

(continued...)

- 16 -

line of cases considered by the Ninth Circuit on this issue. See City of South Lake Tahoe v. California Tahoe Reg'l Planning Agency, 625 F.2d 231, 233-34 (9th Cir. 1980); Indian Oasis-Baboquivari Unified Sch. Dist. No. 40 v. Kirk, 91 F.3d 1240, 1243-44 (9th Cir. 1996), vacated by en banc reh'g, 109 F.3d 634 (9th Cir. 1997) (en banc); see also City of South Lake Tahoe v. California Tahoe Reg'l Planning Agency, 449 U.S. 1039, 1041-42 (1980) (White, J., dissenting from denial of certiorari) (arguing that the Ninth Circuit's denial of political subdivision standing was "inconsistent" with the Court's holding in Board of Educ. v. Allen, 392 U.S. 236 (1968)). Nevertheless, we remain persuaded that the better rule is the one supported by Rogers and Kaw Tribe.

We do not believe that our holding here will lead to the "chaos" asserted by the defendants. Contrary to the defendants' argument, mere disagreement by a political subdivision with the policies of its parent state will not be sufficient to overcome the traditional barrier to political subdivision standing. Instead, our holding simply allows a political subdivision to sue its parent state when the suit alleges a violation by the state of some controlling federal law. The Supremacy Clause guarantees no less.

_____

[8](...continued)
473 F.2d at 929 (containing language supporting a per se rule against subdivision standing to sue its creating state in a case involving only constitutional provisions protecting personal rights, not the Supremacy Clause).

## B.  Injury-in-fact under Article III

In addition to their claim that the school district plaintiffs lack political subdivision standing, the defendants also contend that both the school districts and the individual plaintiffs have failed to demonstrate sufficient "injury in fact" to establish Article III standing.  The defendants argue that any potential loss in revenue that might be suffered by Colorado's public school trust as a result of changes wrought by Amendment 16 is purely speculative and would, in any event, be made up through general appropriations by the Colorado Legislature.

It is well-settled today that the core requirements for showing a "case or controversy" under Article III are three-fold:  A plaintiff must allege (1) an "injury-in-fact," (2) a causal connection between the injury and defendant's actions, and (3) redressability of the injury.  See Steel Co. v. Citizens for a Better Environment, 118 S. Ct. 1003, 1016-17 (1998); Utah v. Babbitt, 137 F.3d 1193, 1202 (10th Cir. 1998).  In order to show an "injury-in-fact," the plaintiff bears the burden of ultimately proving "'an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" Utah, 137 F.3d at 1202 (quoting Bennett v. Spear, 117 S. Ct. 1154, 1163 (1997)).

In this case, we need not wade through the complex question of whether the potential loss of income from the state land trust as a result of Amendment 16 is a

sufficiently concrete and imminent injury under Article III.[9]  See Branson School District, 958 F. Supp. at 1508-11.  Instead, we conclude that all of the plaintiffs have suffered another injury that is equally sufficient, if not more so, to meet the constitutional requirements of Article III.

The essential crux of the plaintiffs' challenge to Amendment 16 is that the ballot initiative's constitutional revisions have injected a series of conflicting interests into the management of the school lands trust.  These new interests – such as managing the trust lands to enhance and protect "beauty" and other environmental concerns, see Amendment 16, § 10(1)(C) – allegedly have diverted the loyalty of the land trust trustees away from the exclusive trust purpose of supporting the common schools.  These allegations state a sufficient Article III injury because the plaintiffs, as beneficiaries of what we hold to be a federal trust over the school lands, have a legally cognizable interest in the undivided loyalty of the school lands trustees.  See Restatement (Third) of Trusts § 170(1) (1992)

_____

[9]Plaintiffs argue that they have met their injury-in-fact burden by alleging that Amendment 16 would result in a diminution in funds allocated to the schools from the trust.  Defendant responds that plaintiffs' claim that schools will receive less money "is entirely speculative" because school funds lost may be made up from other sources; however, we agree with the district court that "money lost from the permanent school-fund is a separate and cognizable injury."  Cf. Restatement (Second) of Torts § 920A cmt. b ("Payments made or benefits conferred by other sources . . . do not have the effect of reducing the recovery against defendant.").  But see ASARCO v. Kadish, 490 U.S. 605, 614-15 (1989) (plurality opinion written by Justice Kennedy for four Justices).

- 19 -

("The trustee is under a duty to administer the trust solely in the interest of the beneficiaries."). As the Restatement commentary makes clear, "In administering the trust the trustee is under a duty to the beneficiaries not to be influenced by the interest of any third person or by motives other than the accomplishment of the purposes of the trust." Id. cmt. (q). Therefore, to the extent that plaintiffs allege that Amendment 16 has divided the loyalty of the school lands trustees away from the sole focus on the support of the common schools toward more generalized interests, the plaintiffs have alleged a sufficient actual and particularized injury to their legal interests. As a result, they have alleged a sufficient "injury-in-fact" for purposes of Article III standing.

## II. Sovereign immunity under the Eleventh Amendment

The defendants next contend that the plaintiffs' suit is barred by the Eleventh Amendment's shield of state sovereign immunity, and that the exception to the Eleventh Amendment under the Ex parte Young doctrine should not apply. We conclude, however, that the Ex parte Young doctrine is properly invoked in this case.

The Eleventh Amendment[10] ensures that a state may raise a defense of

---

[10]The text of the Eleventh Amendment provides:

(continued...)

- 20 -

sovereign immunity against any suit brought against it in federal court by its own citizens or by citizens of another state. See Wisconsin Dep't of Corrections v. Schacht, 118 S. Ct. 2047, 2052 (1998) (noting that sovereign immunity is in the nature of an affirmative defense that may be asserted or waived at a state's discretion); Seminole Tribe v. Florida, 517 U.S. 44, 69-73 (1996) (rejecting the view that the Eleventh Amendment does not apply to suits arising under federal-question jurisdiction). Furthermore, when a suit is brought against state officials in their official capacities, the real party in interest in the case is the state, and the state may raise the defense of sovereign immunity under the Eleventh Amendment. See Kentucky v. Graham, 473 U.S. 159, 166-67 (1985). However, a suit against a state official in his or her official capacity seeking prospective injunctive relief is not considered a suit against the state for Eleventh Amendment purposes. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 n.10 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity

---

[10](...continued)
> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State.

U.S. Const. amend. XI.

- 21 -

actions for prospective relief are not treated as actions against the State.'")
(quoting Kentucky, 473 U.S. at 167 n.14); ANR Pipeline v. LaFaver, 150 F.3d
1178, 1188 & n.10 (10th Cir. 1998).

Sovereign immunity may be overcome if the state waives the defense or if
the plaintiffs' federal complaint seeks only prospective injunctive or declaratory
relief against state officials for an ongoing violation of federal law. See Idaho v.
Coeur d'Alene Tribe, 117 S. Ct. 2028, 2033 & 2040 (1997). In the latter
situation, the exception first announced in Ex parte Young, 209 U.S. 123 (1908),
will allow the federal suit for equitable relief to go forward. See Coeur d'Alene,
117 S. Ct. at 2040 ("An allegation of an on-going violation of federal law where
the requested relief is prospective is ordinarily sufficient to invoke the Young
fiction.").

In this case, the plaintiffs sought only prospective injunctive and
declaratory relief against the implementation of Amendment 16 on grounds that
the ballot measure violated the federal trust created by the Colorado Enabling
Act. In this context, the plaintiffs' suit falls squarely within the traditional
contours of the Ex parte Young doctrine.

The defendants contend, however, that the plaintiffs' suit falls outside the
Ex parte Young doctrine in light of the Supreme Court's recent holding in Coeur
d'Alene. The defendants argue that the injunctive relief sought by the plaintiffs

in this case is not fundamentally different from the kind of relief sought by the plaintiffs in Coeur d'Alene, and because the Court held that the relief sought in Coeur d'Alene was beyond the scope of the Ex parte Young doctrine, we therefore should similarly dismiss the plaintiffs' suit in this case.

In Coeur d'Alene, the Coeur d'Alene Tribe requested both declaratory and injunctive relief against Idaho's state regulation of the banks, beds, and submerged lands of Lake Coeur d'Alene and its tributaries. See Coeur d'Alene, 117 S. Ct. at 2032. The requested declaratory judgment would have established the tribe's "entitlement to the exclusive use and occupancy and the right to quiet enjoyment of the submerged lands as well as a declaration of the invalidity of all Idaho statutes, ordinances, regulations, customs or usages which purport to regulate, authorize, use or affect in any way the submerged lands." Id. The tribe's request for injunctive relief demanded that all of the Idaho officials named in the suit be prohibited from "regulating, permitting or taking any action in violation of the Tribe's rights of exclusive use and occupancy." Id. The majority in Coeur d'Alene described these requests as the "functional equivalent" of a quiet title action, and it held that these requests implicate the state's "special sovereignty interests" in ownership and regulation of its submerged lands. Id. at 2040.

In this case, the plaintiffs have requested a judgment declaring that

Amendment 16 is "in violation of Article VI of the United States Constitution." The plaintiffs also have requested preliminary and permanent injunctions to "enjoin enforcement of Amendment 16."

We do not believe that the plaintiffs' requested relief here "implicates special sovereignty interests." Although a state's ownership of public lands – in addition to its ownership of submerged lands – may well fall within the Supreme Court's ill-defined category of "special sovereignty interests," the plaintiffs' requested relief here would not change the nature of the state's ownership. Instead, the requested relief affects only limited aspects of how the state may manage these public lands. We find it impossible to say that the distinction between, for example, whether a state must manage its school lands to maximize revenues as opposed to managing the land to produce consistent income over time is a distinction that implicates special sovereignty interests. Furthermore, the plaintiffs' requested relief cannot seriously be compared to a quiet title action, in which all or substantially all ownership interests in the lands would be stripped from the state. The far more accurate analogy for the plaintiffs' requested relief is not a quiet title action, but rather the quasi-equitable action for a breach of trust. See Restatement (Second) of Trusts § 199 (1959) ("The beneficiary of a trust can maintain a suit (a) to compel the trustee to perform his duties as trustee; (b) to enjoin the trustee from committing a breach of trust; (c) to compel the

trustee to redress a breach of trust . . . ."); see also Napeahi v. Paty, 921 F.2d 897, 899 & 903 (9th Cir. 1990) (holding that a suit by native Hawaiians against the Director of the Department of Land and Natural Resources for the state of Hawaii alleging an improper abandonment of lands alleged to be part of the state's public trust was properly characterized as a breach of trust action). We have no hesitation in holding that the functional equivalent of a breach of trust action seeking only prospective equitable relief against state officials falls within the scope of the Ex parte Young doctrine. Thus, we conclude that the Eleventh Amendment presents no bar to the plaintiffs' suit in this case.

### III. Creation of a federal trust for Colorado's school lands

Turning now to the substantive merits of this case, we must address the threshold issue of whether the Colorado Enabling Act created a binding federal trust over the school lands granted to Colorado through the Colorado Enabling Act. Despite the defendant's arguments to the contrary, we conclude that Congress did indeed manifest an intent to create a fiduciary relationship for the state of Colorado when it conveyed the school lands to the state. Furthermore, we find that the creation of such a trust was within Congress' powers under the Constitution. As a result, we hold that these school lands are subject to an enforceable federal trust.

## A. Manifestation of intent

As the Supreme Court has noted, the question of whether a statehood statute creates a federal trust requires a case-specific analysis of the particular state's enabling statute because the history of each state's admission to the Union is unique and Congress seems to have experienced an evolution in its legislative approach to school land grants. See Papasan v. Allain, 478 U.S. 265, 289-90 n.18 (1986). For example, early on in the development of school lands jurisprudence, the Supreme Court interpreted the sparse wording of the land grants for Michigan and Alabama as creating nothing more than honorary obligations, albeit in the nature of a "solemn agreement," which is to say, not a trust. See id.; Alabama v. Schmidt, 232 U.S. 168, 173-74 (1914); Cooper v. Roberts, 59 U.S. (18 How.) 173, 181-82 (1856). On the other hand, the Supreme Court has interpreted the later, more specific land grants to New Mexico and Arizona as creating fiduciary obligations on the part of the states to manage the lands for the exclusive benefit of the common schools. See Lassen v. Arizona ex rel. Arizona Highway Dep't, 385 U.S. 458, 460-61 (1967); Ervien v. United States, 251 U.S. 41, 48 (1919). In our case, Colorado's admission to the Union under the 1875 enabling act falls somewhere in between – in both chronology and specificity – the Michigan/Alabama and New Mexico/Arizona experiences.

Before addressing the particular language of the Colorado Enabling Act, we

set out the basic principles on which our interpretive exercise must rely:  A trust is created when a settlor conveys property to a trustee with a manifest intent to impose a fiduciary duty on that person requiring that the property be used for a specific benefit of others.  See Restatement (Second) of Trusts §§ 2, 17, 23 & § 23 cmt. (a) (1959).  That Congress may create a trust through the manifestation of an intent to create a fiduciary relationship is beyond dispute.  See Lassen, 385 U.S. at 460; Jicarilla Apache Tribe v. Supron Energy Corp., 782 F.2d 855, 857 (10th Cir. 1986) (en banc) (adopting the prior panel's dissent, 728 F.2d 1555, 1563 (10th Cir. 1984) (Seymour, J., dissenting), as the en banc majority opinion); see also United States v. Ervien, 246 F. 277, 279 (8th Cir. 1917) (reviewing the language of the New Mexico school lands grant in that state's enabling statute and concluding that "[w]ords more clearly designed than those of the act of Congress to create definite and specific trusts . . . could hardly have been chosen."), aff'd, Ervien, 251 U.S. at 48.  Congress need not use any particular form of words in expressing its intent to create a trust, and the absence of the words "trust" or "trustee" in the conveyance is not determinative of the question of whether Congress intended to create a trust.  See Jicarilla Apache Tribe, 728 F.2d at 1564 (quoting Whiskers v. United States, 600 F.2d 1332, 1338 (10th Cir. 1979)).  Instead, the creation of a trust depends on whether the relevant statutory provision contains "an enumeration of duties" which would justify a conclusion

that Congress intended to create a trust relationship. See Jicarilla Apache Tribe, 728 F.2d at 1564; Restatement (Second) of Trusts § 23 cmt. a ("immaterial whether or not the settlor knows that the intended relationship is called a trust").

With these principles in mind, we believe the Colorado Enabling Act contains a sufficient enumeration of duties to indicate Congress's intent to create a fiduciary relationship between the state of Colorado and its common schools with respect to the management of the school lands. The principal language of Congress' conveyance declares that the school lands "are hereby granted to the said State for the support of the common schools." Colorado Enabling Act § 7, 18 Stat. at 475 (emphasis added). This language, standing alone, would not be sufficient to establish a federal trust because it is no more specific than the language of the Michigan and Alabama grants,[11] which were found to create only "honorary" obligation to support the states' common schools. See Schmidt, 232 U.S. at 173-74; Cooper, 59 U.S. (18 How.) at 182. The language of § 7, however, does not stand alone. The determinative evidence of Congress' intent to create a trust is found in § 14 of the 1875 enabling act. In that clause, for the first time in

---

[11]The language of the Michigan and Alabama school land grants used somewhat similar formulations. For Alabama, Congress conveyed each Section 16 of every township in the new state "to the inhabitants of such township for the use of schools." See Schmidt, 232 U.S. at 172. For Michigan, Congress conveyed each Section 16 in every township "to the State for the use of schools." See Cooper, 59 U.S. (18 How.) at 179.

- 28 -

any of Congress' school-lands legislation, Congress created explicit restrictions on how the school lands could be managed or disposed. <u>See</u> Fairfax et al., <u>supra</u>, at 821 (noting that the sales restrictions in the Colorado Enabling Act marked a turning point in the specificity of Congress' land grants). Congress required the following of Colorado:

> That the two sections of land in each township herein granted for the support of common schools shall be disposed of only at public sale and at a price not less than two dollars and fifty cents per acre, the proceeds to constitute a permanent school-fund, the interest of which to be expended in the support of common schools.

Colorado Enabling Act § 14, 18 Stat. at 476. These restrictions enumerate Colorado's specific duties in the following ways: Congress has prescribed (1) how the school lands are to be disposed, (2) at what minimum price, (3) how the income from these sales is to be held, (4) what may be done with the interest on that capital holding, and (5) Congress has provided for the permanence of the benefit of these assets for the common schools. Most importantly, all of these enumerated restrictions are explicitly imposed to serve Congress' ultimate goal of providing a sound financial basis for the "support" of the state's common schools in perpetuity. In light of this enumeration, we are confident that Congress intended to create a fiduciary obligation for the state of Colorado to manage the school lands in trust for the benefit of the state's common schools.

Our conclusion is buttressed by the immediate response to Congress'

enabling statute by the Framers of the 1876 Colorado Constitution, which expressed the understanding of Colorado's citizens about Congress' intentions. The 1876 Constitution provides the following implicit acknowledgment that Congress had created a trust in the school lands grant:

> The general assembly shall, at the earliest practicable period, provide by law that the several grants of land made by Congress to the State shall be judiciously located and carefully preserved and held in trust subject to disposal, for the use and benefit of the respective objects for which said grants of land were made . . . .

1876 Colo. Const. art. IX, § 10 (amended 1996) (emphasis added). The emphasized language in art. IX, § 10 is the traditional verbiage used to indicate the creation of a trust. See Restatement (Second) of Trusts § 24 cmt (b) (Illustration No. 1) (noting that a conveyance using the words "for the use of" or "for the benefit of" typically indicates an intent to create a trust, absent contrary indications). By requiring that Colorado's legislators quickly pass laws to enforce certain fiduciary obligations for the state, the 1876 Constitution supports the view that Coloradans perceived Congress' school land grant as more than a mere "honorary" obligation, but rather as a legally enforceable fiduciary relationship.[12]

_____

[12]This understanding was perpetuated in the 1996 language of Amendment 16. For example, Amendment 16 inserted into the Colorado Constitution a declaration that "[t]he people of the state of Colorado recognize . . . that the state school lands are an endowment of land assets held in a perpetual, inter-generational public trust for the support of public schools . . . ." See Amendment

(continued...)

## B.  Constitutionality of creation of a federal trust

In what appears to be a permutation of the defendants' "equal footing doctrine" argument below,[13] the defendants now argue that any federal trust created by Congress through the Colorado Enabling Act was in excess of Congress' limited powers under the Admissions Clause and the Property Clause. We reject these arguments as groundless.

The Admissions Clause of Article IV[14] gives Congress the power to admit new states to the Union.  However, through its specification that the entity to be

_____

[12](...continued)
16, § 10(1)(A), 1997 Colo. Laws at 2401 (emphasis added).  Similarly, § 9(6) of Amendment 16 declares that the new State Board of Land Commissioners "shall serve as the trustee for the lands granted to the state in <u>public trust</u> by the federal government . . . ."  <u>See</u> <u>id.</u> at 2400 (emphasis added).

[13]To the extent defendants seek to raise an "equal footing" argument on appeal, we reject it for essentially the reasons articulated by the district court below.  <u>See</u> <u>Branson School District</u>, 958 F. Supp. at 1512-14; <u>see also</u> <u>Crow Tribe v. Repsis</u>, 73 F.3d 982, 990-92 (10th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1221 (1996); <u>State ex rel. Koch v. United States</u>, 47 F.3d 1015, 1018-19 (10th Cir. 1995).

[14]The text of the Admissions Clause provides:

> New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other States; nor any State be formed by the Junction of two or more States, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress.

U.S. Const. art. IV, § 3, cl. 1.

admitted must be a "State," the clause has been read to require that any newly admitted state must be "no less or greater, or different in dignity or power, from those political entities which constitute the Union." See Coyle v. Smith, 221 U.S. 559, 566 (1911). However, Coyle makes clear that Congress may indeed place limitations on a state through the admission process if these limitations "are within the scope of the conceded powers of Congress." Id. at 568, 574. In other words, a limitation imposed through the admissions process is valid if Congress could otherwise impose it on a state that already had been admitted to the Union. As the Court explained, one example of such a valid limitation would be "regulations touching the sole care and disposition of the public lands or reservations" within the state. See id. at 574.

In this case, Congress had the "sole care and disposition" of public land within the federal territory of Colorado prior to the creation of the state of Colorado. In making a beneficial grant of the school lands to Colorado, Congress was doing no more than what the Property Clause of the Constitution allowed, i.e., "to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States. . . ." See U.S. Const. art. IV, § 3, cl. 2. Because Congress could have decided to make this very same beneficial grant of federal land to Colorado after the admission of the state to the Union, there is no violation of the Admissions Clause in Congress' decision to

create the federal school lands trust through the Colorado Enabling Act.

As a final challenge to the constitutionality of Congress' creation of a school land trust for Colorado, the defendants also argue that Congress lacked the power under the Property Clause to create this federal trust because the trust "invades" the state's sovereignty.  The defendants could provide no authority to support this proposition, other than to point to cases interpreting the Tenth Amendment.  See Printz v. United States, 117 S. Ct. 2365, 2376-77 (1997); New York v. United States, 505 U.S. 144, 160 (1992).  We find these cases inapposite in the face of clear language from the Supreme Court that has recognized the very broad powers of Congress under the Property Clause to use and dispose of federal property as Congress sees fit.  See Kleppe v. New Mexico, 426 U.S. 529, 539 (1976) ("[W]hile the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, we have repeatedly observed that the power over the public land thus entrusted to Congress is without limitations.") (quotation omitted); see also Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 330 (1936) ("To the extent that the power of disposition is thus expressly conferred [by the Property Clause], it is manifest that the Tenth Amendment is not applicable.").

### IV.  Validity of Amendment 16 under the Supremacy Clause and the Colorado Enabling Act

We now consider the substantive core of the parties' dispute, i.e., whether the various provisions of Amendment 16 violate the Supremacy Clause of Article VI because of their asserted conflict with the federal trust created by the Colorado Enabling Act. Because the plaintiffs' contention on this point presents a facial challenge to the federal constitutionality of Amendment 16, we must start with the venerable rule of statutory construction that a statute is presumed to be constitutional unless shown otherwise. See Romer v. Evans, 517 U.S. 620, 643 (1996) (Scalia, J., dissenting) ("'A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.'" (quoting United States v. Salerno, 481 U.S. 739, 745 (1987))); Villanueva v. Carere, 85 F.3d 481, 487 (10th Cir. 1996) (applying presumption of constitutionality to a state statute in the face of an equal protection challenge). Although this presumption arises out of the deference courts must pay to the work of legislatures, we believe the same deference applies to the work of a state's citizenry acting through a ballot initiative. Furthermore, in light of this deferential rule of statutory construction, we may not invalidate Amendment 16 if there is some "fairly possible" construction that would confirm the measure's constitutionality. See Communications Workers v. Beck, 487 U.S. 735, 762 (1988) ("Court will first determine whether it is fairly possible to interpret the

- 34 -

statute in a manner that renders it constitutionally valid."). However, as the Court

in Beck acknowledged, "statutory construction may not be pressed 'to the point of

disingenuous evasion.'" Id. (quoting United States v. Locke, 471 U.S. 84, 96

(1985) (quotation omitted)).[15]


## A. Scope of the federal trust

In determining whether Amendment 16 violates Colorado's fiduciary

duties, we must at the outset specify the scope of those duties. In doing so, we

are guided first by the plain language of the enabling act. See Ervien, 251 U.S. at

47-48 (reviewing the particular text of the New Mexico land grant and defining

the scope of New Mexico's duties with respect to those lands based on the

language in the grant). Furthermore, when the plain language of the enabling act

is ambiguous or silent, we must turn to the statute's legislative history and the

background principles of trust law. See Lassen, 385 U.S. at 467-68 (looking to

[15]The court below, and the plaintiffs themselves, assumed on the basis of district court precedent that the plaintiffs must prove the unconstitutionality of Amendment 16 "beyond a reasonable doubt." See Branson School District, 958 F. Supp. at 1517 (citing Villanueva v. Carere, 873 F. Supp. 434, 447 (D. Colo. 1994), aff'd, 85 F.3d 481). This circuit has never applied such a standard of proof to a purely legal question of whether a statute is facially unconstitutional. Cf. Blue Sky Entertainment, Inc. v. Town of Gardiner, 711 F. Supp. 678, 698 n.19 (N.D.N.Y. 1989) ("In essence, the 'beyond a reasonable doubt' standard is suited to resolving questions which involve some element of fact. A question of law is not decided by any standard of decision prescribed for a trier of fact.").

the "background and legislative history of the Enabling Act" to determine the scope of Arizona's trust duties).

Turning to the language of the Colorado Enabling Act, we find three overriding principles expressed there. First, the sole and exclusive beneficiary of the school lands trust is to be the "common schools." See Colorado Enabling Act, § 7, 18 Stat. at 475. As the Supreme Court explained in Ervien, this kind of specific enumeration of the purpose of the federal trust "is necessarily exclusive of any other purpose." Ervien, 251 U.S. at 47. As a result, the plain language of the Enabling Act indicates that the school lands may not be used for any purpose other than "the support of common schools." Second, the sole and exclusive method for disposing of the school lands shall be through a "public sale" with a certain minimum price. See Colorado Enabling Act, § 14, 18 Stat. at 476. This provision indicates that when the state chooses to dispose of its school lands, it must do so in a way that will ensure fair market value of whatever property is being sold. Finally, the Act makes clear that interest from the fund created by these land sales is exclusively and "permanently" dedicated to "the support of common schools." See Colorado Enabling Act, § 14, 18 Stat. at 476.

The language of the Enabling Act is silent, however, as to whether Colorado must actually dispose of all of its school lands. Although § 14 speaks only to procedures for disposal, we do not believe that this exclusive focus means

- 36 -

that Congress meant to strip Colorado of any power to hold the school lands over time or to obtain a full and fair market value through rents and other uses. See Fairfax et al., supra, at 821-22 (commenting that the original school land grants in the early 19th Century apparently required states to hold, rather than sell, the land, and only with the admission of more arid Western states did Congress begin to allow sales as well as leases of school lands); see also State ex rel. Koch v. Barrett, 66 P. 504, 507-08 (Mont. 1901) (holding that the absence of any authorization for leases, as opposed to sales, in Montana's school land grant did not divest the state of the power to lease such lands).

This power to hold rather than sell the school lands was informed by Congress' implicit understanding of common law trust doctrines requiring that a trustee must take steps to preserve the trust property from loss, damage or diminution in value.[16] See Davies v. Lowrey, 15 Ohio 655, 657 (1846) ("It is [a trustee's] duty to manage the trust property with all reasonable diligence, caution, and care, that it may be rendered most productive, without being exposed to loss."); Wyman v. Herard, 59 P. 1009, 1023 (Okla. Terr. 1899) (quoting from the treatise Perry on Trusts, which was a standard reference in the 1870s, that it is

_____

[16]We rely on the common law of trusts to provide a background against which we may better understand Congress' meaning with respect to the Colorado Enabling Act because we have been unable to find – and the parties did not provide – any useful information on the statute's legislative history.

"the first duty of a trustee . . . [is] to secure the possession of trust property, and to protect it from loss and injury"); see also Restatement (First) of Trusts § 176 (duty to preserve trust property).  Overarching all of the trustee's fiduciary duties was the paramount duty to exercise reasonable prudence and care in the management of the trust solely for the benefit of the named beneficiary.  See Restatement (First) of Trusts § 174.

### B.  Specific provisions of Amendment 16

The plaintiffs challenge more than a dozen particular aspects of Amendment 16 as being in conflict with Colorado's fiduciary duties to manage the school lands exclusively for the benefit of the "common schools."  However, we believe that for each provision there is a "fairly possible" construction that reads the ballot measure in conformity with Colorado's trust obligations.  As a result, we do not believe that any provision facially violates the federal trust created by the Colorado Enabling Act.

#### 1.  Establishment of a "sound stewardship" principle - § 10(1)(C)

The philosophical heart of Amendment 16 – and the provision that seems to have prompted the greatest opposition from the plaintiffs – is the initiative's declaration of a principle of "sound stewardship" which should guide the new State Board of Land Commissioners in its management of the school lands.  This

provision declares:

> that the economic productivity of all lands held in public trust is dependent on sound stewardship, including protecting and enhancing the beauty, natural values, open space and wildlife habitat thereof, for this and future generations. In recognition of these principles, the board shall be governed by the standards set forth in this section 10 in the discharge of its fiduciary obligations, in addition to other laws generally applicable to trustees.

Amendment 16, § 10(1)(C). The plaintiffs contend that this provision injects a conflict of interest into the state's fiduciary duties because it will divert the state from managing the school lands for the exclusive purpose of supporting the common schools.

Rather than reading this provision as changing the exclusive purpose of the school lands trust, as the plaintiffs argue, we believe that the "sound stewardship" principle merely announces a new management approach for the land trust. The additional requirement to consider beauty, nature, open space, and wildlife habitat as part of the whole panoply of land management considerations simply indicates a change in the state's chosen mechanism for achieving its continuing obligation to manage the school lands for the support of the common schools. A trustee is expected to use his or her skill and expertise in managing a trust, and it is certainly fairly possible for a trustee to conclude that protecting and enhancing the aesthetic value of a property will increase its long-term economic potential and productivity. The trust obligation, after all, is unlimited in time and a long-

range vision of how best to preserve the value and productivity of the trust assets may very well include attention to preserving the beauty and natural values of the property.

We acknowledge the opposite possibility that the state land board may seek to manage the school land trust for the exclusive benefit of aesthetic values, for the benefit of local non-school interests or for the benefit of the state generally, to the detriment of the state's fiduciary duty to provide support for the common schools. However, that factual scenario has not been presented to us in this facial appeal. Instead, we conclude simply that because it is possible to construe the "sound stewardship" principle in conformity with the state's federal trust obligations to the common schools, we must do so. Thus, we hold that this provision of Amendment 16 does not conflict with the Colorado Enabling Act.

## 2. Elimination of the income maximization obligation - § 10(1)

After setting out the "sound stewardship" principle, Amendment 16 provides for the initiative's crucial change in land management doctrine by striking out the language from the state's 1876 constitution that required the state to manage the school lands "in such a manner as will secure the maximum possible amount therefor." Amendment 16, § 10(1). The provision then replaces this income maximization goal with a new obligation to "produce reasonable and consistent income over time." Id. The plaintiffs contend that these changes

directly conflict with the state's fiduciary obligations.

We disagree because the state's fiduciary obligations do not include a specific duty to maximize income under the Enabling Act. The Act provides no direction regarding when to dispose of land or how to invest the proceeds. Instead, the state has a duty only to obtain fair market value for the school lands when the lands are sold and otherwise to manage the lands solely for the benefit of the common schools. In the absence of explicit duties as to sale of the land and investment of the proceeds, prevailing trust law at the time of the Enabling Act required a trustee to "be governed by a sound discretion and *good faith*." Jairus Ware Perry, A Treatise on the law of Trusts and Trustees § 452, at 566 (4th ed. 1889). The law provided that trustees "must not have speculation in view, but rather a permanent investment, considering both the probable income and the probable safety of the capital." Id. Just as the "sound stewardship" principle did not reflect a change in the purpose of the trust, the new obligation to produce "consistent income over time" also is not a change in the purpose of the trust. Instead, it is merely a new approach to achieving the state's continuing obligation to ensure that the school lands support the common schools. We are, in any event, not able to say facially that a plan to produce reasonable and consistent income over time is inconsistent with the objective of generating the maximum possible income. Thus, because it is possible to read this change as being in

harmony with the state's continuing fiduciary obligations, we hold that requiring

"consistent income over time" does not violate the Colorado Enabling Act.

### 3. Dedication of a "Stewardship Trust" - § 10(1)(b)(I)

Perhaps the most troubling provision for us – in terms of its

constitutionality – is Amendment 16's requirement that the state land board must

create a "Stewardship Trust" of 295,000 to 300,000 acres out of the 3 million

acres currently held by the state and must manage this Stewardship Trust in

perpetuity in a manner that will permit "only those uses, not necessarily

precluding existing uses or management practices, that will protect and enhance

the beauty, natural values, open space, and wildlife habitat thereof . . . ."

Amendment 16, § 10(1)(b)(I). Furthermore, this Stewardship Trust apparently is

intended to be a permanent reservation of school trust lands because the provision

also establishes that "specific parcels of land held in the Stewardship Trust may

be removed from the trust only upon the affirmative vote of four members of the

board and upon the designation or exchange of an equal or greater amount of

additional land into said trust." Id. Thus, through the mechanism of exchanging

parcels of equal or greater size, this restricted-use Stewardship Trust apparently

will never fall below 295,000 to 300,000 acres.[17]

---

[17]In a related, though less troubling, claim plaintiffs argue that § 10(1)(A) of Amendment 16 violates the trust obligations imposed by the Enabling Act by
(continued...)

In light of these requirements, it is conceivable that at some date in the future, after the state land board has disposed of all of its other land, there will be only the 300,000-acre Stewardship Trust remaining in the overall school land trust. At that point the board would be unable to sell the Stewardship Trust acreage even if disposing of the property would be the otherwise economically appropriate course for the benefit of the common schools.

Although we believe it is possible that an ultimate conflict of interest may some day arrive for the land board, we also recognize that it may not. The potential conflict of interest is partly a function of whether the land board ultimately reaches a point where it holds only Stewardship Trust acreage and has no other acreage with which to make exchanges for more economically valuable land in the Stewardship Trust. It is also partly a function of whether, at such point, it is no longer economically prudent to continue to hold the Stewardship

---

[17](...continued)
prohibiting the state from significantly diminishing the trust's land assets. The full text of § 10(1)(A) states: "(1) The people of the state of Colorado recognize (A) that the state school lands are an endowment of land assets held in a perpetual, inter-generational public trust for the support of public schools, which should not be significantly diminished." Despite plaintiffs argument that the object of "which should not be significantly diminished" is "the state school lands," we agree with the district court that the former phrase modifies "public trust for the support of public schools." Accordingly, we read § 10(1)(A) to prohibit the state from significantly diminishing the public schools' trust, which includes other investment assets in addition to land. This obligation comports with the trust obligations imposed by the Enabling Act     .

Trust land in the Stewardship Trust. In that regard we observe that nothing in Amendment 16 prevents the trust from realizing an income stream from Stewardship Trust lands through leases or other arrangements allowing compatible uses. In any event, we note that it has taken Colorado more than a century to sell just 40 percent, or roughly 1.6 million acres, of its school lands. Because it is possible to construe the provisions of the Stewardship Trust as not imposing a conflict with the state's fiduciary duties, we must. We therefore hold that the Stewardship Trust does not violate the Colorado Enabling Act.

4.  Management for long-term goals - § 10(1)(b)(II) & § 10(1)(b)(III)

The remaining changes in Colorado's land management principles for the school land trust flow logically from the overarching philosophy expressed in Amendment 16, and we believe they are easily reconciled with the state's fiduciary duties to the common schools. For example, § 10(1)(b)(II) requires the board to include in its agricultural leases "terms, incentives, and lease rates that will promote sound stewardship and land management practices, long-term agricultural productivity, and community stability." The plaintiffs contend that this provision shifts the exclusive purpose of the land trust from the sole focus of supporting the common schools to include new purposes such as community stability. However, we believe that this section more accurately is read as changing not the purpose of the school land trust, but how it is to be achieved. In

that context, it is not unreasonable for the trustee to determine that the common schools will benefit more from a management philosophy that focuses on long-term agricultural productivity. It is also fairly possible that long-term agricultural productivity and the economic value of the land will be enhanced if the land trust's holdings are managed to protect community stability.

We believe a similar conclusion can be drawn about § 10(1)(b)(III), which requires the land board to manage its natural resource holdings "in a manner which will conserve the long-term value of such resources, as well as existing and future uses, and in accordance with state and local laws and regulations . . . ." It is within the trustee's discretion to determine that the best interest of the common schools would be better served by conserving the land trust's natural resources for their long-term value, as opposed to exploiting them over the short term.

Finally, the plaintiffs contend that the last clause of § 10(1)(b)(III), requiring the land board to conform its management activities to local land use regulations, and a similar provision in § 10(1)(c)[18] both violate the Colorado Supreme Court's decision in People ex rel. Dunbar v. City of Littleton, 515 P.2d 1121 (Colo. 1973). We note first that it appears the holding of Dunbar, involving the exemption of school trust lands from local property taxes, is inapposite to the

[18]The language of § 10(1)(c) requires the land board to "comply with valid local land use regulations and land use plans."

- 45 -

question of whether the school land trust is subject to generally applicable land-use regulations. The latter issue was upheld by the Colorado Supreme Court in Colorado State Bd. of Land Comm'rs v. Colorado Mined Land Reclamation Bd., 809 P.2d 974, 985 (Colo. 1991) ("The [state] constitutional scheme . . . does not contemplate that the State Land Board can ignore a reasonable legislative regulation for the purpose of carrying out its constitutional responsibility of securing 'the maximum possible amount' for public lands."). More importantly, though, there is no reason to believe that compliance with a generally applicable land-use regulation will conflict with the state's fiduciary obligation to manage the school lands for the benefit of the common schools. Thus, neither the goal of long-term resource conservation nor compliance with local land-use regulations rises to a violation of the Colorado Enabling Act.

### 5. Other land management principles - § 10(1)(a) & § 10(1)(e)

Two other land-management provisions of § 10 have prompted complaints from the plaintiffs, but in both instances, the provisions are within the state's discretion as reasonable principles to serve the overall trust purpose of supporting the common schools. Thus, we find no violation here of the Colorado Enabling Act.

First, § 10(1)(a) requires the land board to conduct a kind of impact-analysis before it approves a development plan involving commercial, residential,

or industrial use of the school trust lands.[19]   The plaintiffs argue that this provision puts the interests of individual local school districts ahead of the general interests of all common schools in the state.  However, in requiring a cost-benefit analysis for certain kinds of development plans, Amendment 16 can be read as furthering the goal of "supporting" the common schools because the provision ensures that certain kinds of development projects will not undermine the financial well-being of the school districts.

The other provision, § 10(1)(e), requires the board to give school districts the opportunity to use school trust lands for school sites, either through leases or outright purchases, and mandates that the price "shall not exceed the appraised fair market value."[20]   The plaintiffs contend that by limiting the price for these

---

[19]Section 10(1)(a) provides:

> Prior to the lease, sale, or exchange of any lands for commercial, residential or industrial development, [the board shall] determine that the income from the lease, sale, or exchange can reasonably be anticipated to exceed the fiscal impact of such development on local school districts and state funding of education from increased school enrollment associated with such development.

[20]The full text of § 10(1)(e) provides that the board must:

> Provide opportunities for the public school districts within which such [school trust] lands are located to lease, purchase, or otherwise use such lands or portions thereof as are necessary for school building sites, at an

(continued...)

- 47 -

school sites to nothing more than the fair market value, the land trust will not realize the maximum possible amount for the land. This argument, though, is a non-sequitur. The maximum possible price that a willing buyer would pay to a willing seller is in fact the fair market value for a property. Thus, this provision does not authorize the land board to give any kind of price discount for a school site. For example, if the fair market value of a school trust parcel is significantly higher because of its potential use as a commercial site, then there is nothing in this provision that would allow the land board to sell that parcel for less than that fair market value. The fact that the parcel ultimately will be used for a school rather than a commercial facility does not alter the fair market price for the land.

### 6. Use of trust income - § 3 & § 9(7)

Two other provisions in Amendment 16 deal with how state officials may use money in the permanent school fund that has been created from the sales of school trust lands. However, because both of these sections can be read as falling within the overall trust purpose of supporting the common schools, we find no violation of the Colorado Enabling Act.

First, §§ 3(1)-(3) authorize the General Assembly to fashion legislation that

---

[20](...continued)
> amount to be determined by the board, which shall not exceed the appraised fair market value, which amount may be paid over time.

will allow the state treasurer to use the funds in the permanent school fund to buy

or guarantee the bonds issued by local school districts or to make direct loans to

the school districts.[21]  The plaintiffs contend that in allowing the state to use

money in the school fund in this manner the provision violates the language of the

Colorado Enabling Act that requires the interest from the fund to be used solely

for the support of the common schools.  See Colorado Enabling Act, § 14.  We

believe, however, that using the proceeds from the permanent school fund to

support the borrowing activities of the school districts does indeed fall within the

scope of the mandate to "support" the common schools.[22]

---

[21]The relevant language of § 3 provides:

> In order to assist public schools in the state in providing
> necessary buildings, land, and equipment, the General
> Assembly may adopt laws establishing the terms and
> conditions upon which the state treasurer may (1) invest
> the fund in bonds of school districts, (2) use all or any
> portion of the fund or the interest or other income
> thereon to guaranty bonds issued by school districts, or
> (3) make loans to school districts.

[22]In something of a related argument, the plaintiffs also challenge the opening provision of § 3, which inserts the language "except as provided in this Article IX" into the existing language declaring that the permanent school fund shall remain inviolate and intact.  The plaintiffs contend that this change means that the permanent school fund is no longer "inviolate."  The plaintiffs argue that this introductory provision establishes an authorization for the other inappropriate use of interest income from the permanent school fund that they have challenged.  However, because we believe that all of the provisions of Amendment 16 can be fairly read as preserving the inviolability of the permanent school fund, we find no conflict in the introductory provision of § 3.

Next, the plaintiffs challenge the provision dealing with the use of the permanent school fund to facilitate land exchanges. See Amendment 16, § 9(7).[23] The plaintiffs contend that in authorizing this approach for non-simultaneous land exchanges the plain language of this provision would allow the land board to use the interest income from the proceeds of a land sale toward the purchase of other land. The plaintiffs contend that such a use of the interest income would violate the requirement in § 14 of the Colorado Enabling Act that interest income from the school fund be used for the support of common schools. See Colorado Enabling Act, § 14. To the extent that accrued interest from a nonsimultaneous exchange of land is used to acquire replacement lands which are themselves held in trust for the support of the common schools, it seems to us that such interest is being used for an approved purpose as defined by § 14 of the Colorado Enabling Act.

_____

[23]Section 9(7) provides:

> The board shall have the authority to undertake non-simultaneous exchanges of land, by directing that the proceeds from a particular sale or other disposition be deposited into a separate account to be established by the state treasurer with the interest thereon to accrue to such account, and withdrawing therefrom an equal or lesser amount to be used as the purchase price for other land to be held and managed as provided in this article, provided that the purchase of lands to complete such an exchange shall be made within two years of the initial sale or other disposition.

<u>7. Selection criteria for land board members - § 9(2)</u>

The plaintiffs complain that the selection criteria established in § 9(2) for the new members of the land board will unavoidably inject a breach of the trustees' duty of loyalty because the new members will be explicitly selected based on constituencies that do not relate to the support of common schools. <u>See</u> Amendment 16, § 9(2).[24] This argument fails because there is nothing in this provision that changes the board members' overarching obligation to manage the school land trust for the benefit of common schools, regardless of the constituency with which they previously were associated. Because we may expect that the land board members will abide by their fiduciary obligations, we need not assume that there will be division of loyalties based merely on Amendment 16's selection criteria. Thus, this provision does not violate the Colorado Enabling Act.

<u>8. Waiver of personal liability for land board members - § 9(5)</u>

---

[24]Section 9(2) provides:

> The governor shall endeavor to appoint members of the board who reside in different geographic regions of the state. The board shall be composed of one person with substantial experience in production agriculture, one person with substantial experience in public primary or secondary education, one person with substantial experience in local government and land use planning, one person with substantial experience in natural resource conservation, and one citizen at large.

- 51 -

The plaintiffs also complain that the new land board members have been given a waiver of personal liability for simple negligence with respect to the management of the land trust, and that this waiver violates a fiduciary duty for the trustees to be personally liable for any breaches of trust. See Amendment 16, § 9(5).[25] This argument, however, confuses the individual land board members with the state itself. The Colorado Enabling Act imposes fiduciary duties on the state as a whole, and thus, the trustee for the school land trust is the state of Colorado. The state has chosen to delegate its management of the trust to the land board, but it is the state that will remain liable for any breaches of the trust. Thus, the waiver of personal liability in § 9(5) does not violate the traditional obligation of a trustee to stand ready to make a beneficiary whole for any breaches of trust.

## 9. Miscellaneous provisions

The remainder of the plaintiffs' challenge involves provisions throughout Amendment 16 that the plaintiffs contend cannot be severed from the objectionable provisions. However, because we have not found any provision in

---

[25]Section 9(5) provides:

> The individual members of the board shall have no personal liability for any action or failure to act as long as such action or failure to act does not involve willful or intentional malfeasance or gross negligence.

the initiative that necessarily involves a violation of Colorado's fiduciary duties, we find no conflict in these remaining provisions.

## Conclusion

In enacting Amendment 16, Colorado's voters sought to rewrite the management principles underlying their state's school land trust, shifting the state away from its prior focus on short-term profit maximization toward a more sustainable approach focusing on the long-term yields of the trust lands. We cannot say as a matter of law that this change in management philosophy necessarily will lead to a breach of Colorado's solemn fiduciary obligations arising out of the federal trust enacted by the Colorado Enabling Act. Confronting, as we do in this case, a facial challenge which requires us to apply any "fairly possible" construction of the measure's constitutionality and thus to assume the best about Colorado's future actions, we conclude that Amendment 16 does not violate Colorado's fiduciary duties. As a result, we find no facial violation of the Supremacy Clause of Article VI.

The judgment of the district court is AFFIRMED.